299 F.2d 281
 James P. MITCHELL, Secretary of Labor, United States Department of Labor (Arthur J. Goldberg, Secretary of Labor, substituted as party appellant in the place and stead of James P. Mitchell, resigned), Appellant,
v.
Frank R. PIDCOCK, III, doing business as Pidcock Tobacco Warehouses, and J. E. Ladson, Jr., doing business as Ladson's Leader Tobacco Warehouses, Appellees.
Frank R. PIDCOCK, III, doing business as Pidcock Tobacco Warehouses, and J. E. Ladson, Jr., doing business as Ladson's Leader Tobacco Warehouses, Appellants,
v.
James P. MITCHELL, Secretary of Labor, United States Department of Labor (Arthur J. Goldberg, Secretary of Labor, substituted as party appellee in the place and stead of James P. Mitchell, resigned), Appellee.
 No. 18687.
 United States Court of Appeals Fifth Circuit.
 February 5, 1962.
 Rehearing Denied April 17, 1962.
 
 Bessie Margolin, Asst. Sol., Charles Donahue, Sol. of Labor, Jacob I. Karro, Judah Best, Attys., Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellant.
 R. Lamar Moore, Moultrie, Ga., Moore & Moore, Moultrie, Ga., of counsel, for appellee.
 Before CAMERON, BROWN, and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 The Secretary of Labor brought three suits, consolidated for this appeal, to require certain tobacco warehousemen to comply with the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. In two of the suits the Secretary sued Frank R. Pidcock, III, and J. E. Ladson, Jr., under Section 17 of the Act, to enjoin the defendants from violating provisions of the Act relating to minimum wage and record-keeping requirements. In the third suit he sued Pidcock, under Section 16(c), to recover unpaid minimum wages on behalf of an employee, Dewitt Harrell. The trial judge held that the defendants had violated the Act. He denied an injunction on the ground that it was not necessary to prevent future violations. He granted recovery in the suit for the unpaid back wages. Both sides appealed. We affirm the holding as to the violation of the Act and the award of back wages. We hold that the trial judge exceeded the bounds of discretion in failing to grant an injunction, since there was no reasonable basis for the defendants to refuse to comply with the Act.
 
 
 2
 Pidcock and Ladson operate tobacco warehouses in Moultrie, Georgia. During the operating season of three to four weeks each in July and August the warehouses provide facilities for the local tobacco growers to market their tobacco. The defendants' employees receive and unload the tobacco at the warehouse; weigh, ticket, and arrange the lots on the warehouse floor in preparation for the auction; guard the tobacco while it awaits sale; assist in the auction operations; retrieve floor scrapings to be put up for sale; move the lots out of the warehouse and onto the purchasers' trucks; and take receipts from the purchasers. Substantial portions of it are shipped after sale to points outside the state.
 
 
 3
 Before 1958 the defendants paid their employees wages equal to those prescribed by the minimum wage law.[1] They testified, however, that although they had paid those wages they were not sure of the coverage of the Act. In 1958 they consulted attorneys to inquire whether the Act applied to their operations. The attorneys advised them that "the employees of a tobacco warehouseman are not engaged in commerce or in the production of goods for commerce within the meaning of the Act". Acting on this advice, so they contend, the defendants reduced the wages of certain employees from $1.00 an hour to 75 cents an hour.[2] Investigators for the Wage and Hour Division made several efforts to obtain voluntary compliance.[3] After these efforts failed, the Secretary of Labor filed the instant suits against the defendants to obtain legal enforcement of the Act.
 
 I.
 
 4
 The section basically involved in this appeal, Section 6 of the Fair Labor Standards Act, 29 U.S.C.A. § 206, provides that "[e]very employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at" the prescribed minimum rate.[4] "Commerce" is defined in Section 3(b), 29 U.S.C.A. § 203(b), as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof". The defendants argue that their tobacco warehouse operations do not constitute "commerce or the production of goods for commerce," a contention we find untenable. The gist of their argument is that they handle the tobacco after it has been produced and before it has entered commerce, while it is in transit to the point where it begins its trip in interstate commerce. This argument ignores the fact that the marketing process is as integral a stage in the interstate movement of the goods as other stages concededly within the coverage of the Act. The auctioning of the tobacco is an indispensable step in the overall process. Moreover, there is no basis for believing that commerce does not begin until a point after production of the goods is completed. "Commerce" is a broad term. It overlaps stages of production. It encompasses preliminary steps necessary in the preparation of goods for sale in commerce. Mitchell v. Pilgrim Holiness Church Corp., 7 Cir., 1954, 210 F.2d 879; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 1944, 141 F.2d 331; Atlantic Co. v. Walling, 5 Cir., 1942, 131 F.2d 518. When production ends, commerce has already begun; there is no interval in between the two in which a function so important as marketing can be performed outside the reach of the statute.
 
 
 5
 These general considerations lead us to the specific authority supporting the Secretary's position. The abundance of such authority raises the question whether, against the factual backdrop of this case, the court should accept the defendants' excuse that they relied on advice of counsel.
 
 II.
 
 6
 The defendants assert their good faith and resist any injunction. They rely on their attorney's opinion of July 18, 1958, given in response to their question whether the Act applied to employees of a tobacco warehouseman. In pertinent part, the opinion reads:
 
 
 7
 "You have requested an opinion from us as to whether or not the provisions of the Fair Labor Standards Act, commonly known as the Wage and Hour Law, is applicable to the operator of a tobacco warehouse selling bright leaf tobacco during the tobacco marketing season, i. e., whether the employees of such warehouse operator come within the coverage of the Act. * * * While we have found no case in which the courts have ruled on the status of the employees of a tobacco warehouseman, and the Administrator of the Act has promulgated no regulation directly applicable thereto, it is our opinion that the employees of a tobacco warehouseman are not engaged in commerce or in the production of goods for commerce within the meaning of the Act * * * [I]f the employees of the tobacco warehouseman should be held to be otherwise within the coverage of the Act, their employer would not be required to pay them for any overtime except the number of hours worked in excess of fifty-six hours in any one workweek * * * ¶ Finally, if it should at long last be held and determined that a warehouseman is subject to the provisions of this law, all that could be required of him would be that he should pay his employees the amount, if any, by which their regular compensation was less than $1.00 an hour and one and one-half times the minimum wage for such hours, if any, as any of them worked in excess of 56 hours in any workweek." (Emphasis supplied).
 
 
 8
 We observe, in passing, that the last paragraph is not without significance. We read it as advising the defendants: take a chance; you cannot get hurt; at worst, you may have to pay what the law requires you to pay.
 
 
 9
 If even a half-hearted attempt to research the law had been made in the summer of 1958, it would have shown that there were four decisions squarely holding that the Act covers employees of tobacco warehousemen. Reliance Storage & Inspection Co. v. Hubbard, W.D. Va., 50 F.Supp. 1012; Walling v. Home Loose Leaf Tobacco Warehouse Co., E.D. Ky., 1943, 51 F.Supp. 914; Walling v. Lincoln Looseleaf Warehouse Co., E.D. Tenn., 1942, 59 F.Supp. 601; Fleming v. Kenton Loose Leaf Tobacco Warehouse Co., E.D.Ky., 1941, 41 F.Supp. 255. Although these are district court cases, they have never been questioned, distinguished, or overruled by later authority.
 
 
 10
 From the earliest days of enforcement, the Wage and Hour Division has consistently asserted that the Act applies to tobacco warehouse auctions and employees of tobacco warehousemen. The Secretary of Labor's Interpretative Bulletin on coverage (admitted in evidence by stipulation) specifically cites one of the four cases, Walling v. Home Loose Leaf Tobacco Warehouse Co., as authority for the principle:
 
 
 11
 "employees in * * * warehouses * * * who sort, screen, grade, store, pack, label, address or otherwise handle or work on goods in preparation for shipment of the goods out of the state are engaged in the production of goods for commerce within the meaning of the Act." (Bulletin No. 776, Section 776.16, published as far back as May 1950 in the Code of Federal Regulations, Title 29, Chapter IV, Section 776.16.)
 
 
 12
 The attorney who prepared the opinion for Pidcock testified that he did not recall examining this bulletin. The bulletin was published in the Code of Federal Regulations, however, and in his opinion the attorney made reference to the Administrator's favorable determination on seasonal exemptions. This determination appeared in the same place in the Code in another section.
 
 
 13
 Thanks to the proliferation of decisions these days, one almost may find a case for or against any legal notion. A determined lawyer, therefore, would be expected to extend his research to situations analogous to the situation here. Any lawyer informed in the field of warehousing would have to say that, on the point at issue, if there is a distinction between tobacco auctions and livestock auctions, the difference is that tobacco auctions have a more obvious connection with the Act than have livestock auctions, since the processing and distribution of tobacco is more nearly certain to move the tobacco in interstate commerce. Employees of livestock auctioneers and commission firms receive and handle goods passing through their employer's premises, as do employees of a tobacco warehouseman. The cases uniformly apply the Act to these employees. In Walling v. Friend, 8 Cir., 1946, 156 F.2d 429 the Court held that clerical employees who prepared statements for the sellers were covered. In Mitchell v. Hunt, 5 Cir., 1959, 263 F.2d 913, on which two members of this panel of the Court sat,[5] we held that the Act covered employees of a farmer-employer engaged for the most part in activities relating to the operation of livestock auctions. See also Mitchell v. Bowman, M.D.Ala., 1954, 131 F.Supp. 520; Mitchell v. Carter d. b. a. Home Base Auction Co., D.N.D., 1958, 35 Lab. Cases, para. 71,904, 13 WH Cases 861; and Mitchell v. Valdosta Livestock Co., M.D.Ga., 1953, 24 Lab. Cases, para. 67,917, 11 WH Cases 674.
 
 
 14
 In May 1959, before discussions in August 1959 between the Department's representatives and the defendants' counsel and long before the December discussions, this Court held, in an antitrust suit, as a matter of law, that tobacco warehouse auctions "are a part of, in, and themselves constitute, interstate commerce". Rogers v. Douglas Tobacco Board of Trade, Inc., 5 Cir., 1959, 266 F.2d 636, cert. denied, 361 U.S. 833, 80 S.Ct. 85, 4 L.Ed.2d 75. Rogers cites Currin v. Wallace, 1939, 306 U.S. 1, 9, 59 S.Ct. 379, 83 L.Ed. 441, holding "untenable" the contention that in a warehouse auction the tobacco is not in interstate commerce until sale and delivery to the customer. Rogers cites also Asheville Tobacco Board of Trade, Inc. v. F. T. C., 4 Cir., 1959, 263 F.2d 502, holding that "tobacco auctions are an integral and indispensable part of interstate commerce in tobacco". In Mulford v. Smith, 1938, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092, the Supreme Court described tobacco warehouses as "the throat where tobacco enters the stream of commerce".
 
 
 15
 In Western Union Tel. Co. v. Lenroot, 1945, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414, the Supreme Court said that "in the production of goods for commerce within the meaning of the Act" the term "production" includes "every kind of incidental operation preparatory to putting goods into the stream of commerce". There are many, many analogous cases holding that duties preparatory to distribution come with the Act's coverage. This Court has held that separating scrap from wrecked cars, storing it, and moving it, in preparation for sale is within the Act. Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883. We have held that the Act covers washing bottles for a dairy. Foremost Dairies v. Ivey, 5 Cir., 1953, 204 F.2d 186.
 
 
 16
 In the light of the massive authority against the defendants, it stretches the imagination beyond the breaking point to believe that the opinion was the result of serious research. This is not a case where counsel, aware of an adverse line of authorities and having a reasonable basis for his considered opinion, takes the position that a careful re-examination of the authorities justifies the belief that they may be distinguished or overruled. The opinion unequivocally states that counsel "found no case in which the courts have ruled on the status of the employees of a tobacco warehouseman, and * * * it is our opinion that [they] are not engaged in commerce or the production of goods for commerce". The attorney was an experienced, respected lawyer. He testified that he had one of the largest law libraries in Georgia. It passes understanding that, in the loose leaf tobacco country of Colquitt County, in Moultrie where there are six tobacco auction warehouses, one of the ablest lawyers in the region was unable to find a case ruling "on the status of the employees of a tobacco warehouseman" and that he should reach the conclusion that such employees are not within the Act.
 
 
 17
 Pidcock was twenty-eight years old at the time of the trial. His father had been operating the business for eighteen years. When his father died in 1952, Pidcock took over. He was graduated from college in 1953, spent one year in law school, went into the Army in September 1954, and was discharged in June 1956. In 1955 he had thirty days accumulated leave which he took during the tobacco season, arriving in Moultrie from Korea the day before the market opened and leaving the day before it closed. At the time, his operations were being investigated for violations of the Act. As a result of the investigation, Pidcock made restitution of unpaid back wages to fifteen employees. Pidcock, however, had only brief conversations with the investigator and, of course, after his return to Korea it was not practical for him to contest the coverage.
 
 
 18
 Pidcock was not an ingenuous innocent; he was an experienced, knowledgeable, informed tobacco warehouseman who had cut his eye-teeth on tobacco. Such persons often are as sophisticated on the legal aspects of trade practices as their lawyers. During his college years he conducted his business during the summer; the tobacco auction season coincided with the summer. In 1958 he was President of the Board of Trade, a group composed of the local tobacco warehouse operators, the large companies which purchase tobacco, independent buyers, speculators, and some farmers. Ladson testified that at Board of Trade meetings the members "discuss all matters pertaining to the market with relation to the companies, to the warehousemen, and to our employees". The "terrific" reduction in tobacco acreage in 1957 brought about frequent discussion of how to cut costs,[6] and after Pidcock received the favorable opinion from his attorney, members of the Board of Trade "decided to go ahead and go on the 75 cents * * * paid before". Ladson, who has been in the business since 1939, operates two tobacco warehouses.
 
 
 19
 The appellees' brief on appeal demonstrates that the result reached in the opinion of July 18 was not for lack of competency of the attorney's firm. In the appellees' brief, counsel argue ably, eloquently, and resourcefully, cite numerous authorities, and distinguish adverse decisions ingeniously, showing the complete familiarity with the subject one would expect of competent lawyers handling a matter right down their alley. It is a forceful, effective brief that would be more persuasive, if the issue were novel. The contrast with the opinion of July 18 is startling, even after making allowance for the difference between an opinion to a client and an appellate brief. The opinion of July 18 sends the defendants forth with a blessing but without benefit of expounded thesis or scriptural authority. Our natural inclination is to afford respected lawyers the full measure of respect. We must say, however, that the facts in this case leave us with the inescapable impression that the opinion was an off-the-cuff conclusion based on insufficient research.
 
 III.
 
 20
 When a violation of the Fair Labor Standards Act is established, the decision whether to issue an injunction against further violations rests primarily in the discretion — judicial discretion — of the trial court. We have issued a warning, however, that when the reason for the employer's not seeing is that his head is buried in the sand, assurances by the employer of future compliance do not justify denial of an injunction against future violations. In Mitchell v. Hausman, 5 Cir., 1958, 261 F.2d 778, 780, we said:
 
 
 21
 "We do not think that Hausman's ostrichlike attitude of self-delusion should be accepted as establishing a good faith belief on his part that the Act did not apply to him and his business. `If he did not know, it was because he did not look, or looking, did not see, or want to see what was so plainly there.' Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186, 188. The personal belief of the trial judge that an employer will comply with the Act in the future may not be, in the light of the facts, a sufficient reason for denying an injunction. Lenroot v. Kemp, 5 Cir., 1946, 153 F.2d 153."
 
 
 22
 Reliance on an attorney's opinion, "even in good faith, is not to be considered a safe harbor in every storm". Mitchell v. Blanchard, 5 Cir., 1959, 272 F.2d 574, 577. Stated negatively, and with no intention to extend the principle beyond this type of proceeding, we formulate the principle: reliance on a lawyer's opinion is not a safe harbor if a reasonable man would know that the opinion does not reflect a prudent lawyer's serious efforts to ascertain the applicable law on the subject of the opinion. The accent is on the client, because he is the defendant asserting that he relied on his lawyer. Here, the subject of the requested opinion was a settled point of law, obvious after the most cursory research. Here, repeated requests for compliance, involving discussions with representatives of the Department, put the attorney and employer on notice that they were persisting in ignoring the obvious. We find it incredible that in 1958 an informed, knowledgeable, experienced tobacco warehouseman would have accepted the opinion of July 18 and continued to rely on it. The defendants do protest too much.
 
 
 23
 In reaching the conclusion that an injunction should issue, we are influenced by the objectives of statute and the nature of the proceedings. This proceeding is not comparable with a criminal proceeding in which reliance on the opinion of an attorney is asserted as a defense. The presumption of innocence weights the scales of justice so heavily in favor of a defendant that evidence sufficient to justify an injunction under the Fair Labor Standards Law might be insufficient to support a criminal conviction. And, this proceeding is only superficially related to a suit in equity for an injunction to protect interests jeopardized in a private controversy. The public interest is jeopardized here. The injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out — actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium.
 
 
 24
 The injunction subjects the defendants to no penalty, to no hardship. It requires the defendants to do what the Act requires anyway — to comply with the law. True, it subjects them to correction by contempt proceedings. If this is a hardship, they may avoid it by respecting the law. If they choose to take their chances, they would in contempt proceedings still be able to raise questions of law and of good faith as freely as in the original suit for an injunction. We do not say or imply that injunctions should be issued freely, without regard for the facts, simply because it is the Government asking for the injunction. We say that the manifest difficulty of the Government's inspecting, investigating, and litigating every complaint of a violation weighs heavily in favor of enforcement by injunction — after the court has found an unquestionable violation of the Act.
 
 
 25
 We do not say or imply anything reflecting on the able, experienced, respected district judge; we say only that, as we view it, he exceeded the bounds of judicial discretion in denying the injunction. The trial judge showed what he thought of the defendants' arguments and underscored his evaluation of their lawyers' opinion when he disregarded the challenge to his jurisdiction and granted judgment for the Secretary in the back-pay suit: Under the Act, the court has no jurisdiction if the point at issue is not a settled issue of law.
 
 
 26
 Implicit in the defendants' non-compliance, as we read the briefs and the record, is a certain underlying, not unnatural, Actonian distaste for national legislation affecting local activities. But the Fair Labor Standards Law has been on the books for twenty-three years. The Act establishes a policy for all of the country, and for the courts as well as for the agency required to administer the law. As Mr. Justice Stone said:
 
 
 27
 "* * * in construing a statute setting up an administrative agency and providing for judicial review of its action, court and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through co-ordinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim." United States v. Morgan, 1939, 307 U.S. 183, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211.
 
 
 28
 The finding of a violation of the act is AFFIRMED. The award of unpaid minimum wages is AFFIRMED. The denial of the injunction is REVERSED, and the case REMANDED with instructions to grant the injunction.
 
 
 
 Notes:
 
 
 [1]
 In 1955 Pidcock's operations were investigated by a Wage and Hour investigator, who found that Pidcock was violating the Act by not paying overtime rates. As a result, the management made restitution to fifteen employees of back wages amounting to $277. In early 1956 Pidcock checked with the Wage-Hour Division as to whether a change in the statutory minimum wage rate limited the number of hours his employees could work and was informed that it did not
 
 
 [2]
 The wages of unloaders, buggy boys, scalemen, watchmen, and check-out men, who were principally high school boys, were cut back to 75 cents an hour. The wages of specialized high paid employees were also cut
 
 
 [3]
 In August 1959, an investigator, John Sedberry, conferred with Pidcock and the attorney who had signed the opinion, concerning the employer's failure to comply with the Act. Sedberry referred the attorney to three tobacco warehouse cases settled by consent decrees which Sedberry was familiar with because of his having had a part in handling the files. According to Sedberry's testimony, the attorney, speaking for Pidcock and Ladson, "would not say for sure whether they would comply in the future," and asked for "time to think it over," promising to reply by letter by September 8 to Sedberry's Supervisor in Columbus. No letter was received. Sedberry again, on December 22, 1959, saw the lawyer, who again would not say whether the employers would comply or not in the future. This testimony was not contradicted, nor was there any explanation why the promised letter was not sent, although both Pidcock and the attorney testified after Sedberry. The injunction suits were thereafter filed on March 30 and April 2, 1960, and the back-pay suit on April 26
 
 
 [4]
 Section 11(c) of the Act, 29 U.S.C.A. § 211(c) requires employers subject to the overtime and minimum wage regulations to keep accurate records of the hours and wages of their employees. Coverage under this provision therefore depends on coverage under the overtime and minimum wage provisions
 
 
 [5]
 The organ of the Court in the instant case joined in the majority opinion in Mitchell v. Hunt. Judge Cameron dissented
 
 
 [6]
 The total yield for Colquitt County increased, however
 
 
 
 29
 CAMERON, Circuit Judge (dissenting).
 
 I.
 
 30
 Defending this action for injunction brought against him by appellant Secretary, charging that cause for the issuance of injunction for violation of the Fair Labor Standards Act had been shown, Frank R. Pidcock, III, the appellee, testified as follows:
 
 
 31
 "Q. Now, Mr. Pidcock, if the Court holds that you and your employees, or some of them, are covered by this Fair Labor Standards Act, what is your intention with respect to complying with it?
 
 
 32
 A. I intend to comply one hundred per cent.
 
 
 33
 Q. Have you ever intentionally not complied?
 
 A. No, sir."[1]
 
 34
 The court below accepted Pidcock's statement as true and the promise made in it as trustworthy, and because it did and because of its findings with respect to the stipulations of the parties and other evidence in the record, it reached this conclusion:
 
 
 35
 "Because of the manner of the violations, the nature of the business, the character of the defendant, the reliance in good faith on the opinion of able and competent counsel, and the entire background of the situation as reflected by the proof, there is no reason to anticipate further violations of the Act, and the Court, exercising the discretion in him vested, rules that the plaintiff is not entitled to the relief for which prayer is made in the complaint herein.[2]
 
 
 36
 That is what this case is about. The majority does not think that the law permitted the court below to exercise its discretion so as to deny the injunction, and apparently feels also that it was impermissible for the judge who tried the case to credit the solemn promise, made under oath, by Pidcock. I disagree with the majority.
 
 
 37
 I think the judge who tried the case had ample support for his findings and his conclusions. He had found that Pidcock was a man of good character.[3] The judge was looking straight into Pidcock's face when he made the promise, which the judge credited, and when he repeated the promise on other occasions during his testimony. It has been said that the face is the show window of the soul's stock of goods. It is a universal principle of law that a judge who is looking at a person who makes a statement is in better position to assess the truth of the statement than one who reads the statement from a printed page. The trial judge's estimate of the character and credibility of Pidcock is confirmed by the following colloquy between the court and counsel. Mr. Avery represented the Secretary and Mr. Moore represented Mr. Pidcock and the others accused of violations of the Act and the colloquy arose when the attorney for appellees began calling citizens of the community to testify to the reputation and standing of Pidcock and the other accused:
 
 
 38
 "Mr. Avery: Your Honor, we object to that. I don't think anybody has attacked the reputation of Mr. Ladson. We don't see where that is pertinent. We are willing to stipulate that he has a good reputation in the community. We are making no point of that. We also admit that Mr. Pidcock has a good reputation.
 
 
 39
 "The Court: All right.
 
 
 40
 "Mr. Moore: Well, if they admit it we think it would be all right. We think they have attacked the character and reputation and integrity because they say we have not relied in good faith upon the attorney's opinion, and that is the import of it. I would like to have it stipulated of Mr. Smith and I was to put Mr. Strozier on the stand for the same purpose, and also for the same purpose of testifying that Mr. Gibson's [the attorney] reputation in the community is good.
 
 
 41
 "Mr. Avery: I believe the Court would take judicial cognizance of Mr. Gibson's reputation * * *
 
 
 42
 "The Court: I believe it could take it of nearly all of these gentlemen so far as I know.
 
 
 43
 "Mr. Avery: Well, we'll certainly stipulate that.
 
 
 44
 "Mr. Moore: We will not continue with that then.
 
 
 45
 "The Court: All right. It is so stipulated then that of course Mr. Gibson and Mr. Pidcock and Mr. Ladson are men of excellent reputation. That's agreeable, is it?
 
 
 46
 "Mr. Avery: Yes, sir.
 
 
 47
 "The Court: And the Court will take judicial cognizance of the fact that Mr. Gibson is a good lawyer." [Emphasis added.]
 
 
 48
 A further reason for the acceptance of Mr. Pidcock's plighted word was that it stood alone, and unchallenged by the testimony of any other witness. The court below, as fact-finder, doubtless felt impelled to follow the decisions of this Court in evaluating Pidcock's testimony. This Court has made it abundantly clear in several cases that a fact-finder is not empowered to reject testimony of a witness simply because he may be interested in the outcome of the case. One of them involved a contest with the National Labor Relations Board, N. L. R. B. v. Tex-O-Kan Flour Mills Co., 1941, 5 Cir., 122 F.2d 433, 439: "* * * But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity, but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point. This was squarely ruled as to a jury in Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, and the ruling is applicable to the Board as fact-finder. That the witness was or is an employee of the party in whose behalf he testifies, is not in itself a reason to discard his oath, appears from the cited case, and was extensively demonstrated in Chesapeake & Ohio R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983."
 
 
 49
 We spoke with no less conviction in another case where the government refused to accept a litigant's word under oath. Foran et al. v. Commissioner of Internal Revenue, 1948, 5 Cir., 165 F.2d 705-707:
 
 
 50
 "Here there is direct and positive evidence from the witness who best knows, that this property was for eighteen months being held as an investment and not held for sale to customers. His testimony is consistent with every proven fact. He gives a credible reason why it was not for sale and why finally in 1941 he did sell it. We think the court's refusal to follow the sworn testimony is contrary to law, and requires the setting aside of its fact-finding as it would that of a jury. * * *"
 
 
 51
 But the majority does not accept as trustworthy the promise made by Pidcock. Essentially, the opinion seems to brand his plighted word as a complete fraud made with no intention of performing it.
 
 
 52
 An attempt will be made to analyze briefly the thirteen pages of the majority opinion, couched for the most part in language which would have to be characterized as, at least, graphic and vigorous. First, we find the opinion saying: "The accent is on the client, because he is the defendant asserting that he relied on his lawyer." The client, Pidcock, is referred to in the opinion as "not an ingenuous innocent."
 
 
 53
 As stated by the majority, Pidcock at the time of trial in August, 1960, had reached the ripe age of twenty-eight. His father had died when he was less than twenty, and the running of the two tobacco warehouses had fallen upon his shoulders. He was able, in the interim, to finish his college education, take one year of law, and do a two-year tour of duty in the armed forces, spending a good portion of the time in Korea, all the while attempting to run this business, largely in absentia. He had only one contact with the Wage & Hour representatives prior to the one now in litigation before the Court. It came to a head while he was in Korea, and from there he authorized payment of back wages, which had been figured by a representative of the Wage and Hour Division to be due, amounting to $277.00.[4] The majority concedes that this episode is not of any consequence in the decision of this case.
 
 
 54
 Referring to Pidcock, the majority states: "Such persons often are as sophisticated on the legal aspects of trade practices as their lawyers." It is to be inferred that the majority thinks that Pidcock was one of the sophisticates. Such an assumption could not be based upon the record. The only evidence on the subject was the testimony of Pidcock when asked about his knowledge of the Fair Labor Standards Act: "Other than just pure conversational knowledge of it, an ordinary layman's knowledge, I had never studied it or anything like that."
 
 II.
 
 55
 After Pidcock had been discharged from the army and was able to give full time to the business which had fallen on his shoulders, he consulted a firm of lawyers whom he thought to be "far the most qualified people to render me an opinion;" and, on July 18, 1958, the lawyers rendered him a written opinion, part of which is quoted by the majority. He was advised that, in the opinion of the lawyers, the employees in the businesses conducted by him were not subject to the Fair Labor Standards Act. It is not questioned in the evidence that he laid the facts fully and fairly before the lawyers and that he acted thereafter on their advice in the operation of the businesses in connection with the employees involved in this civil action.
 
 
 56
 The court below, therefore, and this Court really have no choice as to whether Pidcock's statement that he relied in good faith on the lawyer's advice shall be accepted, there being no shred of evidence that this statement was not the whole truth of the matter. The reflections made upon him in the majority opinion arise, not from any fact or deduction which could be made from any fact in evidence; it represents, in my opinion, pure conjecture.
 
 III.
 
 57
 Failing completely to find any just accusation which could be made against Pidcock, the majority proceeds to level its attack against the lawyer,[5] indicating throughout, however, an unsure attitude with respect to him. It says of him: "[He] was an experienced, respected lawyer. He testified that he had one of the largest law libraries in Georgia."
 
 
 58
 The evidence did not justify any other appraisal as to the lawyer's competence, integrity and dependability. It disclosed that the firm was rated by Martindale-Hubble as belonging to the highest class of lawyers, with respect to both moral character and legal ability. The colloquy between court and counsel quoted supra shows that the reputation of the lawyer was of such a high character that the attorney for the Wage and Hour Division invited the court to "take judicial cognizance" of it. The appellant's attorney repeated that twice during the discussion in open court and stipulated that the accused lawyer, along with Messrs. Pidcock and Ladson, "are men of excellent reputation." The court below extended that estimate to the lawyer's legal ability.
 
 
 59
 But the majority was not willing to stand by its first characterization of the lawyer or to accept the estimate of him judicially known by the court below, based upon both personal acquaintance and the attestation of appellant's counsel. To invest its opinion with any show of plausibility, the majority was bound to lay the lawyer low. It was not at a loss to find the adjectives with which to accomplish this.
 
 
 60
 Having sought out the most extreme holdings from the courts of other circuits, many of them being district court decisions — "Thanks to the proliferation of decisions these days, one may find a case for or against any legal notion" — it conjectures that the opinion rendered to Pidcock by the attorney would not have been reached or expressed "If even a half-hearted attempt to research the law had been made." It then infers that any informed lawyer would have been convinced that businesses such as that of Pidcock were covered by the Act and concludes that the lawyer did not make a half-hearted examination of the law. The majority then exclaims that "It passes understanding that * * * one of the ablest lawyers in the region * * reached the conclusion that such employees are not within the Act."
 
 
 61
 In my opinion, not a syllable of the majority's derogatory remarks concerning the lawyer is derived from the evidence. It represents nothing more than suspicion run riot. The lawyer testified before the court below, and stated that the written opinion was based upon what he conceived to be adequate research. He distinguished some of the cases chiefly relied upon by the majority because the facts as to handling tobacco in Georgia differed materially from those in the states where the cases arose. I think the trial court had ample justification for its conclusion that Pidcock placed "reliance in good faith on the opinion of able and competent counsel."
 
 
 62
 I have not entered into debate with the majority opinion on the state of the law as to the status of appellees' employees, although doubt as to the question was as real as in Lublin, infra. The question of the right of the court below to refuse an injunction is too important and too plain to warrant going beyond it. The majority quotes from one case only as sustaining its position here. It starts with the sentence of Mitchell v. Hausman, 5 Cir., 1958, 261 F.2d 778, reading: "We do not think that Hausman's ostrichlike attitude of self-delusion should be accepted as establishing a good faith belief on his part that the Act did not apply to him and his business."
 
 
 63
 The opinion could better have quoted the preceding sentences of Hausman to show something of the facts upon which the quoted statement was predicated. If it had done so, it would not have found in that case support for its holding here:
 
 
 64
 "The appellee [Hausman], when first told by the Labor Department investigator that he was subject to the Act, did not stand by his protestation that his business was not covered * * * again being found in non-compliance the appellee again promised to comply but failed to do so until the suit was brought. The appellee's promises to the investigators were not kept. The previous actions of the appellee of non-compliance indicate that reliance should not be placed upon present promises. * * * When told that the interstate shipment of the hides subjected him to the Act, the appellee made no effort to ascertain the correctness of the statement. He did not seek advice of counsel and, had he done so after Tilbury v. Rogers, supra, [D.C. 123 F.Supp. 109], was affirmed, he would doubtless have been told that he was covered. * * *" [261 F.2d P. 780. Emphasis added.]
 
 
 65
 The facts of this case do not resemble those of Hausman's case.
 
 
 66
 Commenting upon the nature of injunctive relief in cases involving action on legal advice, the judge who authored Hausman said, in Mitchell v. Empire Gas Engineering Co., 5 Cir., 1958, 256 F.2d 781, 785, after concluding that the advice given by a lawyer was not sound advice:
 
 
 67
 "It would be difficult, under such circumstances, to question the court's determination that Empire acted in good faith upon the honest advice of able counsel in its failure to comply with the Act. * * *
 
 
 68
 "It should not be forgotten that the issuance of injunctions in cases such as this is discretionary, as it is in most of the situations where this equitable remedy may be granted. [Citing cases.] The Supreme Court has said:
 
 
 69
 "`The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587, and, of course, it can be utilized without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it.' * * *" [Emphasis added.]
 
 
 70
 The only other case relied upon in the majority opinion as supporting the right of the appellate court to set aside, as an abuse of discretion, the action of the trial court in declining to issue a writ of injunction in a case like this is the decision of this Court in 1959 in Mitchell, Secretary v. Blanchard, 5 Cir., 272 F.2d 574, 577. The decision in that case emphasizes that the employer had engaged in a long period of delay and obstruction, "that there was no good faith reliance on advice from counsel that he was not subject to the act," and that the main question at issue had been settled by two Supreme Court decisions, one of which had been rendered three years before the filing of that suit and the other eight years prior thereto.
 
 
 71
 We have nothing resembling that situation here. This case discloses a good faith reliance on advice of counsel, the absence of any obstructive tactics, and the absence of any authoritative decision by the Supreme Court or any Court of Appeals.
 
 
 72
 The majority opinion, therefore, rests on no decision of the Supreme Court or of this Circuit in any case whose facts closely resemble those here.
 
 IV.
 
 73
 On the other hand, there are Supreme Court decisions and decisions of this Court which directly support the action of the court below in denying injunction. In the recent case of Mitchell v. Lublin et al., 1959, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243, the Supreme Court gave a clear expression of its views with respect to the attitude appellate courts should take towards the action of district judges in granting or denying injunctions in cases brought under the Fair Labor Standards Act. Lublin et al. were an architectural and consulting engineering firm with offices in Washington and Norfolk, Virginia. The district court held that its employees were not covered by the Act, and the Fourth Circuit Court of Appeals affirmed, 250 F.2d 253. The Supreme Court concluded, upon a detailed consideration of the activities of the firm in maintaining offices in two states with the consequent travel across state lines, their engagement in work for various government agencies, including paving of airplane taxi-ways, sewerage systems, hangar facilities, radio and television installations and the repair of government buildings at shipyards, that some of its employees were covered by the Act. These unconnected excerpts from the opinion (pp. 213-215, 79 S.Ct. p. 265) demonstrates that the Supreme Court set a pattern for the issuance of injunctions, which the court below followed:
 
 
 74
 "Although not an issue below and not a matter of disagreement between the parties before this Court, some doubt has arisen whether injunctive relief is proper in this case. * * * Respondent does not appear ever to have urged that an injunction would be improper if, as a matter of law, its employees were `engaged in commerce.' Its position seems correct in light of the specific statutory provision, § 17, 29 U.S.C. § 217, 29 U.S.C.A. § 217, which gives the District Courts jurisdiction to restrain violations of the Act. And the numerous suits brought by the Department of Labor under that section attest to the fact that the commencement of an injunction action, where coverage is in doubt, is not at all unusual. * * *
 
 
 75
 "* * * In any event, upon proceedings on remand, it will still be within the discretion of the District Court whether or not to issue an injunction. If, for instance, respondent discloses its records, enters a stipulation concerning which employees are covered, and agrees not to violate the Act in the future, the District Court might conclude that an injunction is unnecessary. Compare Mitchell v. Bland, 5 Cir., 241 F.2d 808, 810, with Chambers Construction Co. v. Mitchell, supra [8 Cir., 233 F.2d 717], at 725." [Emphasis added.]
 
 
 76
 The selection of the Bland and Chambers cases as patterns to guide district courts in the exercise of their discretion is significant, especially since violation of the Act was found in both cases and one district court granted injunction while the other denied it.
 
 
 77
 In Chambers, the District Court thought the facts warranted the issuance of the injunction and the Court of Appeals, 233 F.2d 717, 724-725, affirmed. Its reasons are summed up in this quotation from its opinion:
 
 
 78
 "* * * we conclude that the trial judge did not abuse the broad discretion vested in him in granting injunctions under § 17, 29 U.S.C.A. § 217. * * *
 
 
 79
 "* * * Where the violation established is likely to resume, the court should grant an injunction. * * * `The defendants insist that they are here not as sinners doing penance but as among the just who need not penance.' * * *
 
 
 80
 "The trial court herein, in granting an injunction against both the corporation and Chambers individually, exercised that broad discretion which under the law is its own. * * * We find no abuse of that discretion. * * *" [Emphasis added.]
 
 
 81
 In Bland, the trial court found that the Act had been violated, but concluded that the violations were not likely to recur,[6] and held that the violations were not intentional and, therefore, "that no adequate cause is shown in accordance with applicable principles of equity for granting an injunction against defendant herein." What this Court held in affirming the denial of the injunction is set forth on page 810 of the opinion, the page referred to by the Supreme Court in Lublin, supra:
 
 
 82
 "But we do not consider these considerations [that is, whether the trial court had correctly found that there had been no intentional violations] of controlling importance. Even assuming appellant's contentions to be sound in both instances, the Court would have been justified in either granting or denying injunctive relief under the broad discretion lodged in it by accepted equitable principles. Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F. 2d 380, 381.
 
 
 83
 "The trial Court evidently reached the conclusion that more could be accomplished towards enforcement of the law and towards bringing appellant into cooperative conformity with its provisions by withholding the drastic remedy of injunction than by using it.
 
 
 84
 "The nature of injunctive relief is that it is prospective, prophylactic, preventive, — not punitive. By bringing about a better attitude on appellant's part towards the Act, and his plighted purpose to obey it scrupulously and ungrudgingly, the Court below was using its equity powers in consonance with their best traditions."
 
 
 85
 The principles announced in Bland and approved by the Supreme Court, and in Mitchell v. Hodges Contracting Co., 1956, 238 F.2d 380, upon which Bland relied heavily, have been widely accepted. The Hodges case has been cited as the settled law of this Circuit in thirteen cases, and it has been accepted as authority by the Courts of Appeal of the First, Third, Sixth and Eighth Circuits. It would seem that even the apostles of change for change's sake would want to respect its accepted principles.
 
 
 86
 These guiding principles have been universally accepted in Supreme Court decisions. A close look at the holdings of one or two of its decisions will illustrate the accuracy of this statement.
 
 
 87
 The first of these is Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 590, 88 L.Ed. 754. The court had before it in that case a statute which concluded with the words: "[that] upon a showing by the Administrator that such person has engaged * * * in any such acts or practices, a temporary or permanent injunction, restraining order or other order [shall] be granted * * *." [Emphasis added.] The statute involved here merely grants to district courts jurisdiction to restrain violations of the Fair Labor Standards Act "for cause shown."
 
 
 88
 Despite the mandatory duty apparently imposed upon courts by the Price Control Act the district court, considering Hecht, Brown v. Hecht, D.C., 49 F.Supp. 528, 532, held that it was not, by the language of that Act, deprived of its inherent equity powers governing the issuance of injunctions: "As generally understood judicial discretion includes the propriety of granting appropriate relief. All rules in equity must necessarily be sufficiently elastic to do justice in the case under consideration. Courts of equity are not inquisitorial but remedial. * * * In a case such as this an injunction should not issue unless thereby better compliance with law may be enforced. Such consideration is addressed to the sound discretion of the court. * * * It is elementary that the purpose of an injunction is to deter rather than to punish. In the circumstances of this case I do not find that there is reason to apprehend future violations of the act and regulations."
 
 
 89
 The decision of the district court was reversed by the Court of Appeals, 137 F.2d 689, and in turn the Supreme Court (321 U.S. 329-330, 64 S.Ct. 587) reversed the decision of the Court of Appeals and sent the case back to the district court to handle the problem according to its discretion:
 
 
 90
 "Only the other day we stated that `An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determination of courts of equity.' Meredith v. Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 88 L.Ed. 9. The historic injunctive process was designed to deter, not to punish * * * The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." [Emphasis added.]
 
 
 91
 In a recent case arising under the Clayton Act, 15 U.S.C.A. §§ 19, 21, 25, United States v. W. T. Grant Co. et al., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, the Supreme Court held that one attacking a district judge's decision for or against the granting of an injunction must show that there was no reasonable basis for such a decision. The district court, D.C., 112 F.Supp. 336, granted summary judgment in favor of certain individuals who had held directorships in competing corporations, but at the time of the trial the situation had changed so that there was no conflict of interest. Upon direct appeal to the Supreme Court the United States contended that injunction against the further violation of the Clayton Act should issue, while the directors claimed that the question had become moot. Following is some of the language used by the Supreme Court in its affirmance of the district judge's denial of the injunction:
 
 
 92
 "* * * The Government brought this direct appeal * * * contending that the cases were not rendered moot by Hancock's resignations and that it was an abuse of discretion for the trial court to refuse any injunctive relief. [p. 631, 73 S.Ct. 896.] * * *
 
 
 93
 "The purpose of an injunction is to prevent future violations, * *. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. [p. 633, 73 S.Ct. p. 898.] * * *
 
 
 94
 "The facts relied on by the Government to show an abuse of discretion in this case are these: Hancock's three interlocking directorates viewed as three distinct violations, his failure to terminate them until after suit was filed despite five years of administrative attempts to persuade him of their illegality, his express refusal to concede that the interlocks in question were illegal under the statute and his failure to promise not to commit similar violations in the future.
 
 
 95
 "Were we sitting as a trial court, this showing might be persuasive. But the Government must demonstrate that there was no reasonable basis for the District Judge's decision. In this we think it fails. * * How much contrition should be expected of a defendant is hard for us to say. This surely is a question better addressed to the discretion of the trial court. The same can be said of the limited disclaimer of future intent. * * *" [pp. 633-634, 73 S.Ct. p. 898. Emphasis added.][7]
 
 V.
 
 96
 Here, therefore, it seems to me, we have this whole controversy settled by recent decisions of the Supreme Court and of this Court. If the trial judge, hearing the testimony and viewing those who give it, decides that there is a likelihood of recurrence, his discretion should be exercised in favor of an injunction. If the judge is satisfied, from what he sees and hears, that there is not a probable likelihood of recurrence, the drastic injunctive remedy should not be applied.
 
 
 97
 The court below found that Pidcock had selected lawyers of excellent reputation who advised him that his operations were not covered. The advice was given in good faith after research and was accepted in good faith by the client; without delay the legal questions were brought to trial, and Pidcock gave his solemn promise that if the decision was against him, he would observe the law scrupulously. These findings are not only amply supported by the evidence, but they are based really upon undisputed evidence. The action of the majority in substituting its discretion for that vested alone in the trial court is, in my opinion, without legal support. The law is all the other way. I think the district judges, who are so persistently importuned by over-zealous government agencies to tie up legitimate business in the toils of injunctions, can be relied upon to recognize what is so transparently clear and to continue to be led in the exercise of the discretion vested in them by these settled principles.
 
 VI.
 
 98
 The majority repeats the argument so often made by spokesmen for the bureaucracies which occupy so large a percentage of the time of the courts in their efforts to substitute government by fiat for government by law: "The injunction subjects the defendants to no penalty, to no hardship. It requires the defendants to do what the Act requires anyway — to comply with the law. True, it subjects them to correction by contempt proceedings. If this is a hardship, they may avoid it by respecting the law."
 
 
 99
 Implicit in this statement is the thought that no good citizen should rebel at having an injunction stamped upon his back; at being placed in a position where federal functionaries will be constantly breathing down his neck; where his every action will be suspect. In this country many lives have been given in the complete repudiation of such a concept as that.
 
 
 100
 Before us is a young man of excellent character and reputation. He went to the best lawyers available and asked their advice about the conduct of his business, and he followed that advice scrupulously and in good faith. Yet the majority would condemn him to the odious status of a constantly watched culprit and, in so doing, it holds that there was no reasonable basis for the district judge's decision, that he did not have the right to exercise his discretion in line with facts which are really not in dispute. The situation thus lightly subscribed to is doubtless not unlike that facing Mr. Justice Brandeis when he wrote these words in Olmstead v. United States, 277 U.S. 438, 478-479, 48 S.Ct. 564, 572, 72 L.Ed. 944:
 
 
 101
 "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men. * * * Men born to freedom are naturally alert to repel invasions of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."
 
 
 102
 I respectfully dissent.
 
 
 103
 Rehearing denied; CAMERON, Circuit Judge, dissenting.
 
 
 
 Notes:
 
 
 [1]
 Appellee was also president of the Board of Trade in the small city of Moultrie, Ga., and he was acting for himself and the parties to the other litigation before us in this action
 
 
 [2]
 The judgment entered based upon the court's findings and conclusions is in these words:
 "Ordered, adjudged and decreed that the injunction prayed for in the complaint be, and the same is hereby, denied."
 
 
 [3]
 "Defendant is shown to be a man of good character, and I find that, in paying the wages specified in Finding 5 and in failing to keep the record referred to in Finding 6, he acted in good faith on the advice of able and competent counsel."
 
 
 [4]
 Pidcock's uncontradicted explanation of the decision to pay the $277.00 is in these words: "I was in Korea and I didn't know the full details of it, and it was a small amount of money, there was no way I could possibly come home to contest it, and there was nobody at home to contest it for me, and rather than get involved in it I went ahead and paid the amount of money."
 
 
 [5]
 At places reference is made to the firm of lawyers to which Mr. Gibson belonged. But it was he whose capacity and intergrity the majority opinion attacks and we will refer to the authors of the legal opinion upon which Pidcock acted in the singular
 
 
 [6]
 After it had conducted an extensive questioning of Bland, the trial court stated in its oral opinion:
 "Defendant testified that he now understands this Act. Defendant promised that he would not violate this Act, and that he would not (directly or indirectly) interfere with its administration or execution and that he would not (directly or indirectly) interfere with any representative of the government engaged in carrying out their duties under this Act.
 "There are clashes. He resents the authority of the government over his business and makes very unfortunate statements. And maybe there were some unfortunate statements made to him." (See Note 5, 241 F.2d 810.)
 
 
 [7]
 And cf. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; May Department Stores v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; 43 C.J.S. Injunctions § 15, p. 426, and 28 American Jurisprudence, Injunctions, § 25, pp. 515-516, and the cases cited in the two texts