W. Willard WIRTZ, Secretary of Labor, United States Department of Labor

v.

SOFT DRINKS OF SHREVEPORT, INC., et al.

Civ. A. No. 12987.

United States District Court, W. D. Louisiana, Shreveport Division.

Dec. 23, 1971.

Charles Donahue, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell and Edwin G. Salyers, U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.

Robert G. Pugh, Pugh & Nelson, Shreveport, La., for William I. Simmons.

Jack H. Kaplan, Abramson, Maroun & Kaplan, Shreveport, La., for Stanley Gilman.

Booth, Lockard, Jack, Pleasant & Le-Sage, Whitfield Jack, Shreveport, La., (court-appointed), for witness Joe W. Harris.

## OPINION

DAWKINS, Chief Judge.

This action was brought by W. Willard Wirtz, then Secretary of Labor, United States Department of Labor, under Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.), (the Act), alleging that defendants violated the provisions of Sections 15(a) (1), 15(a) (2), and 15(a) (5) of the Act and seeking to permanently enjoin and restrain them from violating the aforesaid provisions of the Act, and to restrain them from further withholding payments of unpaid overtime compensation. The complaint alleged that defendants violated Section 6 of the Act, which fixes minimum wages,[1] Section 7 of the Act, which deals with overtime wages and maximum hours,[2] and Section 11(c), which requires the keeping of adequate records.[3]

The case came on for hearing before this Court February 6 and 7, 1968. Having considered all pleadings, testimony of the witnesses, exhibits filed in evidence, and memoranda submitted by opposing counsel, we now make and enter, pursuant to Rule 52, F.R.Civ.P., the following findings of fact and conclusions of law.

Default judgment was entered against Soft Drinks of Shreveport, Inc., February 14, 1968, permanently enjoining and restraining it from violating Section 15(a) (1), Sections 6 and 7 and 15(a) (2), and Sections 11(c) and 15(a) (5) of the Act. It was further ordered that this defendant be enjoined and restrained from withholding payment of minimum wages and overtime compensation to its employees in the total sum of $3,418.38.

Drs. William I. Simmons and Stanley L. Gilman, president and vice president respectively, also were made defendants. Along with these orthodontists, Mrs. Gilman was the remaining stockholder, but was inactive in the corporate affairs and not made a party to the suit.

Soft Drinks is incorporated in Shreveport, Louisiana, with its bottling plant here, and wholesale routes completely within the State of Louisiana. For the period in question, February to December, 1966, this defendant regularly received shipments of Canada Dry products from Dallas, Texas. The consignments were off-loaded and stored at the Shreveport bottling plant, then distributed to retail outlets via driver-salesmen. A variety of the Canada Dry products came in returnable bottles. These containers, along with the bottles emanating locally were collected and returned to Shreveport, where they were sorted for re-use locally or return to Dallas for cleaning and refilling.

The first Wage and Hour investigation in September, 1965, addressed itself only to receipt of goods from out-of-state. A promise was exacted from the corporate

---

1. As to Dixon and Calhoun—employees.

2. As to Ansley, Mitchell, Stevenson, Johnson, Dixon and Calhoun—employees.

3. As to Dixon and Calhoun—employees.

and individual defendants to comply with the Act. Defendants undertook to segregate the work of unloading the Canada Dry interstate truck by assigning to that task certain specified employees.

Another investigation was launched in February, 1966, which revealed violations [4] and at the end of which the coverage of the Act was carefully explained to defendants. They again promised future compliance and agreed to pay employees back wages.

█ The third investigation, in December, 1966, disclosed facts which prompted the Secretary to bring this suit. In the interim before the final investigation, attempts were made to decrease the number of people handling Canada Dry products which were sold on the various routes and the returnable bottles which were collected. Defendants assigned one route truck to handle exclusively interstate goods. We find that these efforts diminished contact by some of the employees, but it did not prevent them from regularly and recurringly collecting and sorting Canada Dry returnable bottles. We are not unmindful that employees are considered "engaged in commerce" within in the meaning of Section 207(a) only if a "substantial part" of their work comes within the terms of Section 203 (b). Inconsequential employment is not enough. The evidence satisfactorily supports a finding that the activities with interstate characteristics were regular, recurring and substantial.[5]

Testimony and exhibits prove that several employees were induced to sign back-wage receipts and to endorse checks which were returned to defendants, or who were not paid in any amount following the February investigation. As a result of this testimony, criminal investigations were launched by the United States Attorney, but no criminal charges were filed. It cannot be disputed that those amounts are due the employees for work done but not adequately compensated under the Act. In addition to those amounts, the Secretary is suing to recover wages due employees for work done and inadequately compensated in violation of the Act from February to December, 1966.

The issues to be resolved by us in the latter respect are as follows:

1. Were certain of the defendants' employees during the period from February, 1966, to December, 1966, engaged in commerce or in the production of goods for commerce within the meaning of the Act?

2. Were the defendants, William I. Simmons and Stanley L. Gilman, employers within the meaning of the Act?

3. Should we issue an injunction against the defendants and require them to make restitution to their employees?

---

4. It is unclear whether the second investigator, T. A. Lane, found that the company had failed to rectify the earlier situation. Our opinion of the law and facts renders it unecessary to resolve that issue.

5. "Section 776.3—Persons engaging in both covered and noncovered activities "Although employees doing work in connection with mere isolated, sporadic, or occasional shipments in commerce in substantial amounts of goods will not be considered covered by virtue of that fact alone, the law is settled that every employee whose engagement in activities in commerce or in the production of goods for commerce, even though small in amount, is regular and recurring, is covered by the Act. This does not, however, necessarily mean that an employee who at some particular time may engage in work which brings him within the coverage of the Act, is by reason of that fact thereafter indefinitely entitled to its benefits." Interpretative Bulletin 776, titled "General Coverage of the Wage and Hour Provisions" (29 CFR 776, Sub-part A).

In Walling v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1942), the Court said that in order to establish that an employee is covered by the Act, the Secretary is required to show that a substantial part of the employee's activities relate to goods moving in interstate commerce.

## 1.

### EMPLOYEES ENGAGED IN COMMERCE OR IN THE PRODUCTION OF GOODS FOR COMMERCE?

Defendants during the pertinent period operated a soft drink business, producing, selling, and distributing a variety of carbonated flavors. All the drinks were canned in Shreveport except for the Canada Dry products which were obtained in cases from Dallas, Texas, and brought to the defendants' plant monthly. After delivery there, orders were received from intrastate customers whom route salesmen would service. The empty Canada Dry bottles were often mixed in with the bottles of other beverages. Defendants' employees were required to sort out the Canada Dry bottles and keep them separate from the other bottles. When another delivery of Canada Dry products was made, returnable bottles would be loaded by the employees onto the Canada Dry truck for return to Dallas for re-use.

█ The evidence indicates that despite defendants' efforts to limit the handling of Canada Dry bottles to employees who were paid in compliance with the Act, others who were not properly compensated regularly handled and sorted returnable bottles. It is the particular employees which determine coverage under the Act. Consequently we must decide which employees and which week said employees participated in duties that were of an interstate character.[6]

We find that Joseph Ansley, R. G. Mitchell, Jesse James Stevenson, Robert G. Johnson, Kenneth Dixon, and Edward Lee Calhoun were engaged in the handling, sorting, unloading, and loading of Canada Dry bottles which activity clearly caused them to engage in commerce or in the production of goods for commerce.

Ansley was employed during the pertinent period normally in the chocolate room at defendants' plant, running a pressure machine. He was one of the men permanently assigned to the Dallas truck. Throughout the week, Ansley, along with others, would be engaged in sorting bottles preparatory to their local re-use or interstate return to Dallas. None of the witnesses were able to determine the actual period when there was only one route truck handling the Canada Dry products. However, it was a common occurrence for Canada Dry bottles to be mixed in with cases of different flavors, even when supposedly one route was to handle the Canada Dry products exclusively.

Johnson's principal duties were in the plant, though in the mornings he might load trucks and in the evenings unload them. When time permitted, and the number of unsorted cases required it, Mitchell would separate bottles. Johnson testified that he occasionally unloaded and loaded the Dallas truck and worked on the Canada Dry route truck. These tasks with interstate characteristics occurred weekly, though not every day, for each of the employees concerned.

Stevenson's duties included feeding the soaker, loading trucks, unloading trucks, and working in the chocolate room. He spent time handling Canada Dry products, sorting, loading and unloading them.

Johnson and Dixon had duties in the plant. Each operated the cooker in the chocolate room, and both loaded and unloaded the Canada Dry route truck and sorted bottles, including Canada Dry bottles, when other duties permitted.

Calhoun was employed as a route truck helper, and as such he was exempt from the overtime provisions of the Act. His

---

6. The general rule applicable to segregation of qualifying from non-qualifying weeks is that once the employee has demonstrated regular or recurrent qualifying work for the time in question the burden shifts to the employer to prove the segregation of weeks if he seeks to prove such a differentiation. 29 CFR (Rev.1968) Section 776.4(b). Anderson v. Mt. Clemens Pottery Company, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

duties included the handling of Canada Dry ginger ale and other products, loading the fulls onto the truck, collecting the empties on the route, and unloading the empties upon return to the plant.

We find as a fact that each employee regularly handled Canada Dry products and returnable bottles as a substantial part of his employment. It is unnecessary to discuss the employees' corroborating evidence, testimony *inter sese,* and from others. A reasonable interpretation of the testimony is that even during the six months' period in which the Canada Dry products were supposedly handled on only one route, many of the employees at the plant loaded and unloaded the route truck and sorted bottles in which stray Canada Dry containers were regularly found. It is our impression that the instructions issued by Simmons and Gillman via the plant manager were not followed. The testimony has it that, when the route trucks came in, many plant employees were directed to assist the drivers' helpers with expediting the unloading and loading process. Although all the men concerned would not each day work with the Canada Dry route truck, we find that during the week most would regularly assist in unloading and loading the truck. Whoever missed that duty certainly found himself, along with others, sorting bottles among which were Canada Dry returnables.

The conclusions of law which result from these findings are predicated on the principle that this Act is "remedial with a humanitarian end in view," and is entitled to broad construction to effectuate the widest possible employee coverage. Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1946); Mitchell v. Empire Gas, 256 F.2d 781 (5 Cir., 1958).

It is readily apparent that employees handling, loading, and unloading goods moving in commerce (the Dallas truck) were "engaged in commerce," [7] within the meaning of the Act during weeks when so engaged. Moreover, and more importantly, we conclude that the involved employees were engaged in the "production of goods for commerce," as well, since the handling of Canada Dry returnable bottles was part of a continuous process affecting the movement of goods across the State line.

Under the definition of the term, Section 3(j), "an employee shall be deemed to have been engaged in the production of goods" not only if he is employed in producing goods in the colloquial sense, but also if he is employed "in . . . handling, transporting, or in any other manner working on such goods." Our courts have held a wide variety of activities which were not production in the ordinary sense of the word to be "production" within the meaning of the primary definition in Section 3(j). Mitchell v. Pidcock, 299 F.2d 281 (5 Cir., 1962) reh. den'd; Foremost Dairies v. Ivey, 204 F.2d 186 (5 Cir., 1953); Phillips v. Star Over-All Dry Cleaning Laundry Company, 149 F.2d 416 (2 Cir., 1945); Young v. Calderera, 12 W.H. Cases 217 (E.D.Ark.1954).

Three cases laid the ground work for a Fifth Circuit decision which we conclude is dispositive of this issue: (1) In Stewart-Jordan Distributing Co. v. Tobin, 210 F.2d 427 (5 Cir., 1954), the Secretary had brought suit against a beer distributor engaged in the distribution of beer, ale, and wine in the City of Jacksonville, Florida. Distribution was wholly intrastate, but the products distributed were shipped from out-of-state to Jacksonville. The Secretary maintained that driver helpers who collected, sorted, and stored returnable bottles which were subsequently shipped out-of-state were subject to the Act's provisions. The Court held, refusing to follow Clougherty v. James Vernor Co.,

---

7. For cases holding that the term "engaged in commerce" is to be given a broad, liberal construction rather than a strained technical one, see Overstreet, v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed 656 (1942); Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1958).

187 F.2d 288 (6 Cir., 1951) and Walling v. Sanders, 136 F.2d 78 (6 Cir., 1943), that:

"The record reveals that at the time appellant purchases the beer from the out-state breweries it has a set agreement with them that they will buy back at a stipulated price all the empty cases and bottles which appellant cares to return to them. And pursuant to their agreement and understanding appellant gathers the empty cases and bottles 'for the purpose of sending them back.' Thus from the moment they are picked up by appellant's drivers and helpers their intended destination is beyond the warehouse to a specific out-state brewery.

"The fact that all of appellant's business is not shown to have an interstate character is not important. Nor is it important that some of the helpers' activities relate to other aspects of appellant's business which is shown to have an intrastate character. For, as was pointed out in the Jacksonville Paper Company case: 'The applicability of the Act is dependent on the character of the employees' work.' Kirschbaum Co. v. Walling, supra, 316 U.S. [517], page 524, 62 S.Ct. [1116], 1120, 86 L.Ed. 1638. * * *"

(2) Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37 (5 Cir., 1962), held under similar circumstances to *Stewart-Jordan* that employees handling returnable bottles whose ultimate destination was out-of-state were "engaged in commerce."

(3) The third decision, one upon which defendants rely, is Mitchell v. Hygrade Water & Soda Co., 285 F.2d 362, 364 (8 Cir., 1960). As the Court succinctly stated, the Secretary did "contend (a) that the instant employees are engaged in the production of goods *for commerce* within the meaning of the Act, or (b) if not engaged in production of goods for commerce, they are at least employed in a 'closely related process or occupation directly essential to' such production within the second part of the definition of 'production' found in § 203(j)." The driver's helpers unloaded the filled bottles and cases at the customer's premises and collected empty bottles and cases from the premises and placed them on the trucks. Many of the bottles picked up by the helpers were re-used in the production and sale of the beverages. Approximately 10% of the returnables were sold in interstate commerce. The Court found that the *production* of the beverage began when a new or returned bottle was placed in the conveyor, rinsed, sterilized, and inspected. None of the employees for whom the Secretary was bringing suit were engaged in this activity. The Court held:

"Considering the purposes of the Act we must rule that the 'goods' contemplated by the Act are 'the goods made, worked on, or handled by the employer in its business as a subject of commerce,' and since [the employees] neither make nor sell the bottle, we are in full accord with the trial court's conclusion that the bottle is not the goods contemplated by the Act."

Similarly, the Court rejected the alternate contention that the employees were engaged in any closely related process or occupation directly essential to the production of the goods.

Defendants urge that we decide the case under the rationale of the Eighth Circuit. Though we find the facts of the case *sub judice* are distinguishable from those in Wirtz v. Pepsi Cola Bottling Co. of Augusta, 342 F.2d 820 (5th Cir., 1965), we conclude that the gravamen of its holding clearly resolves the issue before us adversely to the defendants. The Fifth Circuit panel approved the dissent in *Mitchell,* writing:

" * * * It appears too clear to us for argument that these used bottles are goods that are the subject of commerce and that they are permitted to become such subject of commerce only because of the activity of these employees. We think it equally clear that these affected employees are engaged in 'handling' and 'transporting' and that they are thus actually engaged in

the production of goods for commerce without reference to the alternative test of being 'in any closely related process or occupation directly essential to the production thereof.' \* \*

"It is perfectly clear from this record that the use of the very bottles handled by these employees is essential to the continued flow of commerce in bottled Pepsi Cola across state lines. It makes no difference whether the [defendant] sells the bottles in commerce or merely supplies them as a container (of course, a necessary one) for the bottled drink. \* \* \* " (At p. 823.)[8]

The employees concerned were route helpers who entered the customers' establishments, removed bottles of other brands from the wooden cases or "flats," filled the flats with empty Pepsi Cola bottles and loaded the flats on the truck. After serving the last customer, the truck returned the empty bottles to the plant where empties were unloaded by other employees and "placed in the plant for use without any segregation as between Georgia and South Carolina routes." (At p. 821.)

We are not writing on a clean slate and thus feel compelled to accept the controlling Fifth Circuit pronouncement defining "goods," so as to include returnable bottles.[9] Therefore, we must conclude that not only were the defendants' employees engaged "in commerce" but also "in production of goods for commerce."

## 2.

### WERE SIMMONS AND GILMAN EMPLOYERS?

■ In the Fair Labor Standards Act, an "employer" includes: "Any person acting directly or indirectly in the interest of an employer in relation to an employee. . . . " 29 U.S.C. § 203

(d). Section 7 of the Act provides that no "employer" shall employ certain employees such as those here involved for more than 40 hours per work week unless he pays overtime at a rate not less than one and one-half times the regular rate at which they are employed. Liability for violation of this provision is fashioned by Section 16 of the Act, 29 U.S.C. § 216(b). The latter Section reads, in pertinent part:

"[A]ny employer who violates the provisions of . . . section 207 . . shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation. . . . " (Emphasis added.)

On its face, the statute adopts a definition of the term "employer" much broader than that of the common law. The Act foresees the possibility of simultaneous "employers," any one or all of which may be liable as an employer under the Act.

■ The Fifth Circuit holds that it is essentially a question of fact whether a person is an employer. "Each case must be considered in light of the total situation or whole activity to determine whether an employer-employee relationship exists." Wirtz v. Lone Star Steel Co., 405 F.2d 668 (5th Cir., 1968). In light of the broad and liberal purpose of the Act, we must avoid technical concepts of the employment relationship and examine the economic realities presented by the facts of each case. Goldberg v. Whittaker House Cooperative, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); Wirtz v. Instant Handling, Inc., 19 W.H. Cases 883 (S.D.Ala., 1970).

■ Upon applying the "economic reality" test to the present facts, we conclude that there can be no doubt of the appropriateness of treating Simmons and Gilman individually as employers. Both owned substantial interests in Soft

8. See Wirtz v. Ray Smith Transport Company, 409 F.2d 954 (5th Cir., 1969), cert. den'd, 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450; Wirtz v. B. B. Saxon Company, 365 F.2d 457 (5th Cir., 1966), reh. den'd.

9. See Hodgson v. Royal Crown Bottling Co., 324 F.Supp. 342 (N.D.Miss.1970).

958

Drinks and were executive officers of the corporation and, as such, were in complete control of the operation of the business of the corporation. Each regularly visited the plant and conferred with one another and Mrs. Gilman on the policies set for the plant. The Doctors characterized their relationship with the corporation as merely one of investment. However, the facts virtually compel us to conclude that they were employers and consequently may be liable for whatever wages we find to be merited, along with the corporation. Hodgson v. Arheim and Neely, Inc., 444 F.2d 609 (3rd Cir., 1971); Wirtz v. Instant Handling, Inc., 19 W.H. Cases 883 (S.D.Ala., 1970); Hodgson v. Royal Crown Bottling Co., 324 F.Supp. 342 (N.D.Miss., 1970); Shultz v. Chalk-Fitzgerald Construction Co., 309 F.Supp. 1255 (D.Mass., 1970). Cf. Wirtz v. Pure Ice Co., 322 F.2d 259 (8th Cir., 1963).

3.

### INJUNCTIVE RELIEF AND RESTITUTION?

■ The Secretary seeks to enjoin defendants from future violations of the Act, and seeks to recover back wages for the employees. When considering this feature of the case, the evidence clearly shows that defendants had been investigated three times by the Wage and Hour Division of the Department of Labor. When advised of the Secretary's position, defendants did not bring themselves into compliance with the Act. Defendants are no longer in the soft drink bottling business, allegedly having lost some $270,000 in the venture before selling and urge that as a reason for preventing an injunction from issuing.

Decision as to whether an injunction should issue lies in the discretion of the district court. Goldberg v. Cockrell, 303 F.2d 811 (5th Cir., 1962). However,

the Fifth Circuit has adopted a strong position on the question of injunctive relief in wage-hour cases. The Courts have declared that actions by the Secretary seeking to recover back wages for employees are brought in the public interest and to correct a continuing public offense. Wirtz v. Jones, 340 F.2d 901 (5th Cir., 1961); Shultz v. Parke, 413 F.2d 1364 (5th Cir., 1969); Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296 (5th Cir., 1969); Shultz v. Morris, 315 F.Supp. 558 (M.D.Ala., 1970). Circuit Judge Coleman, in Shultz v. Parke, supra, discussed the exercise of the trial judge's discretion in issuing injunctions:

"We think, therefore, that while in cases of this nature the trial court sits and decides in the exercise of that sound discretion ordinarily attributed to courts of equity the function is nevertheless restricted by the requirement that it must be done 'with an eye to the purposes of the Act.'" (At p. 1368.)

Aware of this admonition, and the fact that an "injunction subjects [an employer] to no penalty, to no hardship. It requires [him] to do what the Act requires anyway—to comply with the law" (Mitchell v. Pidcock, 299 F.2d 281, 287 (5th Cir., 1962) reh. den'd), we hold that the responsibility for compliance be shifted to the employers in any of their future endeavors and that the individual defendants also be enjoined from future violations of the record-keeping requirements and continuing withholding unpaid wages to the employees. Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508 (5th Cir. 1969); Hodgson v. Ricky Fashion, Inc., 434 F.2d 1261 (5th Cir., 1970).

■ Consequently, It is ordered that an injunction issue against Stanley L. Gilman and William I. Simmons from future violations of Sections 6, 7, and 11(c) of the Act.[10] It is further or-

10. Numerous Fifth Circuit opinions have required that an injunction issue against defendants from future violations of the Act. Injunctive relief was not granted in two District Court decisions, Wirtz v. William H. LaDew of Louisiana, Inc., 282 F.Supp. 742 (E.D.La., 1968), and Shultz v. Union Trust Bank, 297 F.Supp. 1274, 18 W.H. Cases 790 (M.D.Fla., 1969). Clearly, LaDew is inapposite to

dered that defendants are enjoined from withholding amounts under the Act's minimum wage and overtime provisions due their former employees, to-wit, Joseph Ansley, $487.25; R. G. Mitchell, $323.75; Jesse Stevenson, $316.00; R. G. Johnson, $475.50; Kenny Dixon, $379.65; Edward Lee Calhoun, $1,443.-60.[11]

It is further ordered that defendants make restitution to those employees who the record shows were induced to sign false back-wage receipts or who were not paid in any amount following the February investigation, to-wit, Joseph Ansley, $253.30; Jesse Stevenson, $270.81; Kenny Dixon, $19.60; Robert G. Johnson, $74.36; Eugene Collins, $142.44; Larry Holland, $131.43; Wesley Porter, $7.03; Edward Calhoun, $184.50; Joe D. Granson, $45.00.

the facts we find in *Soft Drinks*. Unlike that case, we heard evidence that top management was aware of the trangressions that occurred at places immediately under management's review and supervision, and the overtime which was worked was not done voluntarily. Judge Cassibry denied the injunction exacting future compliance, but noted that "this does not absolve the defendant of his obligation to pay the overtime required by law." (At p. 311.)

District Judge Krentzman concluded that there was no need for an injunction restraining defendant from future violations of the Act because "the defendant is a reputable member of the business community and has not operated Earle Restorium since October, 1968." (At p. 1276.) That latter fact places Union Trust closely within the circumstances of the case under consideration. Nevertheless, we order the injunction.

The discretion as to issuance *vel non* of an injunction has been severely limited by recent decisions of the Fifth Circuit which hold that "when an employer, without excuse or explanation, violates the provisions of the Fair Labor Standards Act the district court as a general rule should issue an injunction restraining the employer from further violations." Goldberg v. Mathews, 303 F.2d 814, 817.

11. The Ninth Circuit, in Wirtz v. Malthor, Inc., 391 F.2d 1, (9th Cir., 1968) decided that there were two purposes for the

Section authorizing the Secretary to seek restraint against withholding back wages. The Court of Appeals reversed the District Court's denial of a remedial injunction, writing:

"First, the restraint was meant to increase the effectiveness of the enforcement of the Act by depriving a violator of any gains accruing to him through his violation. Second, the amendment was meant to protect those employers who comply with the Act from having to compete unfavorably with employers who do not comply." (At p. 3.) See also Wirtz v. Jones, 340 F.2d 901 (5th Cir., 1965).

We will not permit employers to evade paying the amounts due to the employees. Failure to maintain records for Dixon and Calhoun: Plaintiff carried the burden of proof as to the extent of the violation of the minimum wage and overtime provisions of the Act. Defendants did not present evidence of the hours worked by these two employees. Therefore, the Secretary is entitled to recovery in the amounts which can be computed from the findings, even though the result be only approximate. This is obtained not only from direct evidence but from the reasonable inferences to be drawn from it. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); Schultz v. Kip's Big Boy, Inc., 431 F.2d 530 (5th Cir., 1970); Wirtz v. Lieb, 366 F.2d 412 (10th Cir., 1966).