Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor

v.

SABINE IRRIGATION COMPANY, INC., et al.

Civ. A. No. 791419.

United States District Court, W. D. Louisiana, Lake Charles Division.

Nov. 30, 1981.

---

Barbara G. Heptig, U. S. Dept. of Labor, Dallas, Tex., for plaintiff.

G. Allen Kimball, Kimball, McLeod & Dow, Lake Charles, La., for defendants.

## MEMORANDUM RULING

VERON, District Judge.

### I. Introduction

This is a civil action brought by the Secretary of Labor, United States Department of Labor, pursuant to Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq., hereinafter referred to as the Act), to enjoin defendants from violating the minimum wages found by the court to be due defendant's employees under the Act, together with interest thereon at the rate of nine percent per annum from the dates such amounts became due. Trial was had to the court, sitting without a jury, on May 27, 1981.

Plaintiff claims that the defendants employed a number of persons to supply the labor necessary to furnish water for irrigating agricultural products; that these employees were engaged in the production of goods for commerce within the meaning of the Act, 29 U.S.C. § 203(j); and that therefore the defendants were subject to the minimum wage provisions of the Act. Plaintiff further contends that defendants willfully violated the minimum wage provisions of the Act within the meaning of Section 6 of the Portal-to-Portal Act of 1947 (29 U.S.C. § 255). Plaintiff seeks an injunction restraining defendants, Sabine Irrigation Company, Inc., C. H. Alberding, and J. E. Scally, from future violations of the Fair Labor Standards Act and from withholding the payment of minimum wages due defendant's employees under the Act.

Defendants concede that Sabine Irrigation Co., Inc. was an employer within the meaning of the Fair Labor Standards Act and therefore subject to the minimum wage provisions of the Act, but contend that defendants Alberding and Scally exercised no supervision or control over Sabine's employees and therefore are not employers within the meaning of Section 3(d) of the Act. In the alternative, defendants contend that they did not willfully violate, if at all, the minimum wage provisions of the Act within the meaning of Section 6 of the Portal-to-Portal Act of 1947 (29 U.S.C. § 255), and therefore the two year statute of limitations period should apply.

After considering all the evidence adduced at trial and having had the benefit of memoranda submitted by the parties, the court makes the following findings of fact and conclusions of law:

### II. Findings of Fact

1. Defendant Sabine Irrigation Company, Inc. (hereinafter Sabine) was, at all times material to this action, a Louisiana corporation within the jurisdiction of this court.

2. Defendant Alberding, a non-resident of Louisiana, was, at all times material to this action, president of Sabine and subject to the jurisdiction of this court.

3. Defendant Scally, a non-resident of Louisiana, was, at all times material to this action, vice-president of Sabine and subject to the jurisdiction of this court.

4. At all times material to this action, Sabine was engaged in the business of pumping water from the Sabine River through a canal into the rice fields of west Calcasieu Parish, Louisiana. Sabine's operations were essential to the growth and production of rice, most of which was subsequently transported outside the state of Louisiana.

5. To carry on this irrigation business, Sabine employed men to operate and maintain the pumping station, check and repair levees, weed canals, and construct and maintain bridges, gates, flumes and underpasses. The court finds that these men were employed as "irrigation workers" rather than "agricultural workers" and as such were entitled to minimum wages of $2.20 per hour in 1976, $2.30 per hour in 1977 and $2.65 per hour in 1978.

6. Although the testimony is in conflict as to whether defendants Sabine, Alberding and Scally had knowledge of the application of the Fair Labor Standards Act to their employment practices prior to 1976, the court finds that there is sufficient evidence to charge all defendants with knowledge of the existence of the Act.[1]

7. At all times material to this action, Sabine's business address, as evidenced by correspondence, income tax returns and checks, was P. O. Box 1379, Tulsa, Oklahoma (hereinafter referred to as Tulsa office). Located under the same roof as Sabine in the Tulsa office, though not carrying the same post office address, were the following corporations: Tulsa Apartments Corporation, Hotel Services Company, Universal Wholesale Supply Company, Sabine Water Canal, Inc., and Washington-Youree Corporation.[2] At all times material to this action, defendant Alberding served as president, defendant Scally as vice-president, and defendant Alberding's wife, B. W. Alberding, as secretary-treasurer of the above listed corporations.

8. Sabine's stock is currently owned in equal amounts (50% each) by Sabine Water Canal, Inc. and Washington-Youree Corporation. All stock in Sabine Water Canal, Inc. and Washington-Youree Corporation is owned by defendant Alberding's son-in-law, Tucker Moore. All stock in Hotel Services Company is owned in equal amounts (50% each) by defendant Scally and defendant Alberding's wife, B. W. Alberding.

9. Defendant Alberding is president of the Jokake Inn Corporation and the Royal Palms Corporation, both of which operate hotels in Phoenix, Arizona. Defendant Scally and defendant Alberding's wife, B. W. Alberding, serve as vice-president and secretary-treasurer respectively of these corporations. Defendant Alberding owns 50% of the stock in the Jokake Inn Corporation and defendant Scally serves as an advisor to Royal Palms Corporation.

10. At all times material to this action, Sabine's Tulsa office administered the business affairs of Sabine Irrigation Company and defendant Alberding maintained contact with the Tulsa office several times a week. Miriam Covington, an employee of Hotel Services Co., and Shirley Goddard, an employee of Tulsa Apartments Corporation, were responsible for, and did pay, all bills incurred by Sabine Irrigation Company.[3] If there were insufficient funds in the Sabine account, defendant Alberding would authorize Mrs. Covington to transfer funds from the Hotel Services account. On occasion, defendant Alberding would send a personal check or a check drawn on the account of some other corporation to cover the deficiency. All payroll checks for Sabine's employees were cut and mailed from the Tulsa office and all records regarding payment of Sabine's bills and payroll were kept in the Tulsa office. The Tulsa office deducted

---

1. The Wage-Hour Division of the U.S. Department of Labor investigated Sabine in the early 70's at which time the requirements of the Fair Labor Standards Act were explained. Defendants Alberding and Scally had previously defended against suits for violations of the FLSA in *Brennan v. Rolling Hills Management Corp.*, Docket # 71–C–240 (N.D.Okl.1971); *Dunlop v. Tulsa Apt. Co.*, Civil Action # 73–C–309 (N.D. Okl.1973)—which was dismissed after defendants entered a stipulation of compliance; and *Dunlop v. McAlester Corp.*, Civil Action # 75–117–C (E.D.Okl.1975).

2. Rolling Hills Management Co., Indian Hills Properties, Inc. and McAlester Corp. were also listed at this office, but they are not relevant to this action.

3. Mrs. Goddard would cut the checks and Mrs. Covington would sign and mail them. Mrs. Covington had been employed by defendant Alberding for over 30 years.

federal income tax and social security from the payroll and all records pertaining to these withholdings were kept in the Tulsa office. The Tulsa office handled all insurance arrangements for Sabine Irrigation and ensured that all ad valorem taxes were paid on Sabine real estate. Finally, the Tulsa office handled all Sabine's income tax returns.

11. The day to day affairs of Sabine Irrigation were handled by either Joe or Patricia Bond.[4] As local supervisors for Sabine, the Bonds tabulated the hours worked by each employee and filled out payroll worksheets which were forwarded to the Tulsa office weekly for payment.[5] They had authority to make routine purchases necessary to carry on maintenance work but had to clear special purchases through the Tulsa office. Although there is conflicting testimony as to whether the Bonds had the general authority to hire and fire employees and fix the rate of pay, the court finds that the Bonds were authorized to maintain a regular workforce, but were required to clear the hiring of additional men through the Tulsa office.[6] The court also finds that the Bonds had no independent authority to set a rate of pay or otherwise bargain with individual employees on a wage scale basis. Mrs. Bond's uncontradicted testimony establishes that the Bonds could not grant raises and that new employees were automatically paid the same rate as their predecessors. The Bonds had no authority to write checks on Sabine's Lake Charles checking account and forwarded all bills received from local charge accounts to the Tulsa office for payment. Finally, when rice was sold and Sabine received a check for their one-fifth share, the Bonds

either deposited it in the Lake Charles checking account or forwarded it to the Tulsa office.

12. Defendants Alberding and Scally made decisions and took management action which directly affected Sabine Irrigation Company. At all times material to this action, defendant Alberding, through his employee Miriam Covington, exercised pervasive control over Sabine's financial and business affairs. His authorization was needed to make special purchases, to hire extra men and to transfer funds necessary for meeting Sabine's payroll and trade account obligations. In addition, defendant Alberding, along with defendant Scally, had sufficient management authority to make decisions directly affecting Sabine's daily operations.[7] In 1972, defendant Scally was involved with a United States Department of Labor investigation concerning the application of minimum wages to Sabine employees and in 1974 he sent a memo to Mr. Bond instructing him on the wage scale applicable. In February of 1976, defendant Scally executed a note payable to Joe Bond on behalf of Sabine Irrigation and later that same year, denied a request from area rice growers to adjust the water rent downward. In February of 1979, defendant Scally granted an easement to Continental Oil Company to construct, operate and maintain a pipeline on Sabine Irrigation's land.

13. Sabine's financial records reflect numerous dealings between the named defendants and Sabine Irrigation and other corporations owned and controlled by the defendants. While the testimony was conflicting in this area, it is clear that at

---

4. Mr. Bond actively supervised the men working on maintenance projects for Sabine until he became ill with cancer in 1976. Mrs. Bond assisted him during his illness and took over the position after his death on April 1, 1978. She did not supervise any of the maintenance work. Mrs. Bond worked for Sabine until Mr. Alberding relieved her in October, 1978.

5. The payroll worksheet contained the name of each employee, the hours worked, the rate of pay, the gross amount before taxes and a total of all the salaries of all employees.

6. While the evidence establishes that Mr. Bond fired one employee he caught sleeping on the job, the evidence also establishes that the Bonds exercised little or no discretion in the hiring and firing of Sabine's employees. The reason for this is that the job attracted only transient labor which constantly turned over of its own accord.

7. The evidence establishes that in 1977 both defendants considered instituting a policy for Sabine Irrigation regarding a cut-off date for irrigating.

various times Sabine Irrigation had financial dealings with Hotel Services Company (of which defendant Scally and defendant Alberding's wife each own 50% of the stock), Sabine Water Canal and Washington-Youree Corporation (all stock of which is owned by defendant Alberding's son-in-law, Tucker Moore), and Jokake Inn Corporation (of which defendant Alberding is president and owner of 50% of the stock).

(a) Sabine's records reflect that in 1978 they held a note receivable from Sabine Water Canal in the amount of $68,768.20 for which Sabine collected interest in the amount of $7,869.10. The records also reflect an account payable at the same time to Sabine Water Canal in the amount of $47,176.48.

(b) In fiscal 1980, the records reflect that Sabine Irrigation paid an unknown "fee" of $10,000.00 to Hotel Services Company after Sabine ceased operations and that defendant Alberding got credit for $12,000.00 in crop damages. In addition, the records show that in 1980, Sabine's salary account was debited $1,666.66 and the Hotel Services Account was credited $1,564.49. Finally, Sabine Irrigation had a net profit in excess of $17,000.00 for 1980.

(c) In fiscal 1979, Sabine records show a net profit of $93,000.00.

(d) Sabine records reflect that in 1978 a paper transaction took place wherein Sabine Irrigation was credited $19,800.00 and defendant Scally was debited $19,800.00 on the books of the company. In addition, Sabine paid $10,000.00 rent to Sabine Water Canal and $10,000.00 rent to Washington-Youree Corporation.

(e) In 1977, Sabine paid rent totalling $40,000.00 to the corporations mentioned in (d) above, and an additional $7,183.00 toward the upkeep of Alberding's Chicago office. Finally, Sabine paid out $51,000.00 in salaries in addition to the laborers' wages for repair and maintenance of the canal and levy which were listed separately on the profit and loss statement.

(f) In 1976, Sabine Irrigation had income of approximately $200,000.00 out of which it paid rent totalling $70,796.60 to Sabine Water Canal and rent totalling $70,796.60 to Washington-Youree Corporation. In addition, $10,000.00 was paid to Universal Wholesale Supply Company and $12,000.00 was paid to Hotel Services Company. Finally, defendant Scally received a salary of $8,000.00, $3,000.00 was paid toward defendant Alberding's Chicago office and defendant Alberding was credited with $10,000.00 on the books of Sabine.

14. Each of the individuals listed in Sabine's payroll records for the period between October 17, 1976 and November 27, 1978, were employed by Sabine Irrigation Company. These employees were paid for the hours recorded on the face of the payroll records at the hourly wage indicated thereon. These wages were less than the minimum applicable and minimum wages and interest thereon at the rate of nine percent per annum are owed for the period since October 17, 1976.

III. Conclusions of Law

1. Jurisdiction

This court has jurisdiction over the parties and over the subject matter of this action pursuant to Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.), hereinafter referred to as the Act.

2. Employers

Defendant Sabine Irrigation Company, Inc. is an employer within the meaning of Section 3(d) of the Act (29 U.S.C. § 203(d)). The question faced by the court is whether defendants Alberding and Scally are also employers within the meaning of the Act. Section 3(d) of the Act broadly defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."

Whether a person is an employer is essentially a question of fact. According to the Fifth Circuit, this requires that "each case must be considered in light of the total situation or whole activity to determine whether an employer-employee relationship exists." *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668 (5th Cir. 1968). Furthermore, in considering the total situation, the courts are to "avoid technical concepts of the employment relationship and examine the economic realities presented by the facts of each case." *Wirtz v. Soft Drinks of Shreveport, Inc.*, 336 F.Supp. 950, 957 (W.D.La. 1971).

■ Applying the "economic reality" test to the facts of this case, there can be no doubt that defendant Alberding should be held to be an employer. Mr. Alberding is, and always has been, president of Sabine Irrigation Company. Since 1976, Mr. Alberding, through his employee Miriam Covington, has exercised pervasive control over the business and financial affairs of Sabine Irrigation. The evidence is clear that Mr. Alberding maintained continuous contact with his Tulsa office and indirectly controlled many matters traditionally handled by an employer in relation to an employee (such as payroll, insurance, and income tax matters). In addition, the evidence is clear that Mr. Alberding's financial gymnastics directly affected Sabine's employees by making it possible for Sabine to meet its payroll and keep its employees supplied with the equipment and materials necessary to perform their jobs. Thus, we hold that Mr. Alberding is an employer within the meaning of the Act and therefore personally liable along with Sabine Irrigation Co. for any wages found to be due and owing to the employees in question.

■ Applying this same test to defendant Scally, the court cannot so readily conclude that he should be treated as an employer. Although Mr. Scally was Sabine's vice-president, the Secretary has not established that he maintained contact with either Sabine or the Tulsa office or acted directly or indirectly in the interest of Sabine in relation to its employees at any time pertinent to this action. To support its contention that Mr. Scally should be treated as an employer, the Secretary points to the fact that in early 1976 Mr. Scally executed a note payable to Joe Bond on behalf of Sabine Irrigation; that later that same year Mr. Scally denied a request from area rice growers to adjust the water rent downward; and that in 1979, Mr. Scally granted an easement to Continental Oil Co. over Sabine property. While these facts may be sufficient to establish that Mr. Scally had management authority, they certainly do not establish that he acted directly or indirectly in the interest of Sabine in relation to its employees.[8] Thus, the court concludes that Mr. Scally is not an employer within the meaning of the Act and therefore cannot be held personally liable for any wages found to be due and owing.

3. **Employees Engaged in the Production of Goods for Commerce**

■ Section 6(a) of the Act (29 U.S.C. § 206(a)) provides that "every employer shall pay to each of his employees who in any workweek is engaged . . . in the production of goods for commerce . . . wages at the following rates: . . ." Furthermore, Section 3(j) of the Act (29 U.S.C. § 203(j)) states that "for purposes of this act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, . . . or in any other manner working on such goods, *or in any closely related process or occupation directly essential to the production thereof*, in any state." (emphasis supplied).

The evidence is clear that at all times material to this action, defendants were engaged in the business of pumping water from the Sabine River through a canal into the rice fields of west Calcasieu Parish, Louisiana. Defendants' operations were es-

---

**8.** The fact that Mr. Scally instructed Joe Bond on Sabine's applicable wage scale in 1974 is not probative of whether Mr. Scally was an employer between 1976 and 1979, especially in light of the testimony that he was retired as of 1976.

sential to the growth and production of rice, most of which was destined for, and subsequently transported, outside the state of Louisiana. To carry on these operations, the defendants employed men to operate and maintain the pumping station, check and repair levees, weed canals, and construct and maintain bridges, gates, flumes and underpasses. Thus, the court concludes that the defendants' employees were engaged in the production of goods for commerce within the meaning of Section 3(j) and as a consequence were covered by the Act at all times between October 17, 1976 and November 24, 1978.

Furthermore, the court finds, as the defendants' payroll records clearly show, that at all times material to this action, defendants' employees were paid at the rate of two dollars per hour. Thus, the court concludes that the defendants were in violation of the provisions of Section 6 and 15(a)(2) of the Act (29 U.S.C. § 206 and 215(a)(2)) which prescribes minimum wages of $2.20 per hour in 1976, $2.30 per hour in 1977, and $2.65 per hour in 1978.

### 4. Willfulness

■ The test for finding willfulness is whether "the employer knew or suspected that his actions might violate the FLSA . . . Did the employer know the FLSA was in the picture?" *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir. 1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). The evidence is clear that the defendants previously defended against suits alleging violations of the FLSA on three separate occasions. On one occasion (*Dunlop v. Tulsa Apt. Co.,* Civil Action No. 73–C–309 (N.D.Okl.1973)), suit was dismissed after the defendants entered a stipulation of compliance. In addition, defendants had previously been investigated by the Wage-Hour Division of the U.S. Department of Labor. Thus, the court concludes that the defendants had knowledge of the existence of the FLSA. Whether they knew of the changes in the provisions of the FLSA that took irrigation workers out of the agricultural exemption is of no moment.

Since defendants' violations were willful, the statute of limitations for this action is three years (29 U.S.C. § 255(a)), and computation of wages due commences with October 17, 1976. Since the defendants' payroll records indicate the number of hours worked by each employee during the period between October 17, 1976 and November 24, 1978, the amount of back wages due is to be figured by multiplying the difference between the minimum wage and the two dollars per hour actually paid, by the number of hours worked.

### 5. Injunction

■ The Secretary seeks to enjoin the defendants from future violations of the FLSA and from withholding minimum wages found to be due for past violations.

Section 17 of the Fair Labor Standards Act (29 U.S.C. § 217) provides, in pertinent part, as follows:

> The district courts . . . shall have jurisdiction, for cause shown, to restrain violations of Section 15, including in the case of violations of Section 15(a)(2) of the restraint of any withholding of payment of minimum wages or overtime compensation found by the Court to be due to employees under this Act. . . .

An action under this section is not an action "to collect a debt owed by an employer to his employee but to correct a continuing offense against the public interest." *Wirtz v. Jones,* 340 F.2d 901, 904 (5th Cir. 1965). As such, an injunction under the Act is designed to stop existing violations and prevent future infractions. It has the effect of shifting the responsibility for compliance with the provisions of the Fair Labor Standards Act onto the employer's shoulders. *Dunlop v. Davis,* 524 F.2d 1278 (5th Cir. 1975).

In light of the defendants' prior violations of the Act, this court concludes that they should bear the burden of complying with its provisions. Accordingly, we hold that an injunction restraining future violations of the FLSA and from withholding minimum wages found to be due is neces-

sary and will hereby issue against defendants, Sabine Irrigation Co. and C. H. Alberding.

Counsel for plaintiff should submit a judgment consistent with this opinion within ten days of date.