**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**SCHOOLHOUSE FOUR, INC., et al., Defendants.**

**Civ. A. No. 81–0314–B.**

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Sept. 12, 1983.

Marshall H. Harris, Joan M. Roller, Philadelphia, Pa., Francis X. Lilly, John P. Alderman, Roanoke, Va., for plaintiff.

Carl E. McAfee, Norton, Va., Clyde Montgomery, Inglewood, Cal., for defendants.

Anthony Trigiana, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL, District Judge.

This case came on to be tried before the court without a jury on August 2 and 3, 1983. After considering the pleadings, the evidence, and the arguments of counsel, the court now files its Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Defendant Schoolhouse Four, Inc. ("Schoolhouse Four") is, and at all times hereinafter mentioned was, a corporation with an office and place of business located at Ewing and Blackwater, Virginia. Schoolhouse Four manufactures clothing. Defendant Timothy McAfee, although listed as President of Schoolhouse Four, took no role whatsoever in the management of Schoolhouse Four at the relevant time involved in this lawsuit. Consequently, he was dismissed as a party defendant at the close of the plaintiff's case-in-chief. Defendant Anthony Trigiani, labeled a "consultant" to Schoolhouse Four, actively participated in the daily activities of Schoolhouse Four, visiting the Ewing plant on a regular basis and making recommendations not only as to its manufacturing activities but also as to firing of employees. Defendant Clyde Montgomery was plant manager of the Ewing facility of Schoolhouse Four. Montgomery actively managed, supervised, and directed the operations and personnel of the Ewing plant. The annual dollar volume of Schoolhouse Four at all times during the period 1978 to date has been

well in excess of $250,000. Goods were sold to businesses in New York, Tennessee, Massachusetts, and New Jersey.

2. Geraldine Clouse, Janice Clouse Hensley, Ethel Chadwell, Janet Harris Smith, Ethel Hall, Cheryl Skidmore Williams, Charlotte Scott, and Janice Martin were employed at the Ewing plant of Schoolhouse Four as sewing machine operators before and during October 1978. Prior to October 1978, in the Fall of 1976, these eight women worked in this same plant, then operated under the corporate name Miss Virginia, Inc. Shortly after Miss Virginia, Inc. shut its doors in the fall of 1976, the Ewing plant was bought by Schoolhouse Four. Operations soon resumed at the plant with the eight women performing the same jobs for Schoolhouse Four that they had performed for Miss Virginia, Inc.

3. Miss Virginia, Inc. failed to pay a number of its employees, including the eight women named in paragraph 2 *supra*, for the last week to two weeks of its operation.

4. On advice of Thomas Rasnic, an attorney in Jonesville, Virginia, a number of former employees of Miss Virginia, Inc., including the eight women named in paragraph 2 *supra*, filed suit in the Circuit Court for Lee County on May 24, 1978, against Schoolhouse Four, Anthony Trigiani, and Pascal Dean for the failure of Miss Virginia, Inc. to pay them wages for the last week to two weeks of operation of Miss Virginia, Inc. This suit was filed pursuant to 29 U.S.C. § 216(b). Mr. Rasnic's theory was that an officer, shareholder, or successor corporation is liable for the wages of a defunct corporation. The court finds that this lawsuit was filed with probable cause and was not frivolous.

5. A summons was issued on October 18, 1978, for a deposition of the eight women named in paragraph 2 *supra* in connection with this Lee County lawsuit. This

deposition was to be held in the office of Mr. Rasnic on October 19, 1978.

6. On October 18, 1978, Clyde Montgomery called into his office the eight women scheduled for the deposition the next day. He told them that if they testified the next day their jobs would be in jeopardy.

7. Present at the deposition on October 19, 1978, were the eight women named in paragraph 2 *supra*, Mr. Rasnic and his secretary/receptionist Gailya Rasnic, Anthony Trigiani and his attorney Mr. Carl McAfee, and the court reporter. Charlotte Scott was deposed first. At the conclusion of her testimony, Mr. Trigiani left the deposition room, went to Mrs. Rasnic's phone, dialed a number, and said in a voice loud enough to be heard by all the women in the waiting room, "Charlotte Scott is no longer employed at Schoolhouse Four". After all the women had testified,[1] Mr. Trigiani again used the office phone, saying this time, "Fire them all".

8. The eight women named in paragraph 2 *supra* returned to the Ewing plant after the deposition. At the plant, Clyde Montgomery told each one that she was fired. He did not let them pick up their personal belongings at their workstations, but instead sent a supervisor to pick up their belongings.

9. While the eight women named in paragraph 2 *supra* were eventually able to find replacement employment, they remained without jobs for periods ranging from one week to more than nine months. In addition, several of the women were required to incur additional travel costs to their new jobs located a greater distance from their homes than the Ewing Schoolhouse Four plant. The court heard no evidence which asserted that any of the eight women were less than diligent in finding replacement jobs.

---

1. Cheryl Skidmore Williams did not testify at the deposition because she had not yet signed her consent form, required by 28 U.S.C. § 216(b), to be a part of the Lee County suit.

She left the deposition early as a result. Nevertheless, she was fired as well by Clyde Montgomery on October 19, 1978.

10. The difference between what Ethel Chadwell would have earned at Schoolhouse Four had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $650.68.

11. The difference between what Geraldine Clouse would have earned at Schoolhouse Four had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $8,237.20.

12. The difference between what Ethel Hall would have earned at Schoolhouse Four had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $1,474.80 [2].

13. The difference between what Janice Clouse Hensley would have earned at Schoolhouse Four had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $5,413.90.

14. The difference between what Janice Martin would have earned at Schoolhouse Four until December 30, 1978, when she quit her replacement job and moved to Maryland, had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $477.04.

15. The difference between what Charlotte Scott would have earned at Schoolhouse Four had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $969.68 [3].

16. The difference between what Cheryl Skidmore Williams would have earned at Schoolhouse Four had she not been fired on October 19, 1978, and what she actually earned at her replacement job, plus her extra travel costs incurred, is $513.20.

17. Janet Harris Smith, had she not been fired on October 19, 1978, would have earned $388.80 at Schoolhouse Four until she was physically unable to work after November 18, 1978.

### Conclusions of Law

1. This court has jurisdiction based on Section 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 217.

2. Plaintiff has made out a clear case of retaliatory firing under 29 U.S.C. § 215(a)(3). This provision states that "it shall be unlawful for any person

(3) to discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding ..."

Schoolhouse Four, through its agent Clyde Montgomery, on October 18, 1978, threatened the eight women by warning them that their jobs would be in jeopardy if they testified at a deposition scheduled in a lawsuit they had filed under the Fair Labor Standards Act to recover backpay. This threat was then carried out by Mr. Trigiani and Mr. Montgomery the next day after the depositions of the women. The prohibitions of 29 U.S.C. § 215(a)(3) are directed to "any person". Furthermore, based on its volume of business in interstate commerce, Schoolhouse Four is subject to all provisions of the Fair Labor Standards Act under 29 U.S.C. § 203(s)(1) as an "[e]nterprise engaged in commerce or in the production of goods for commerce".

Defendants' conduct in first threatening and then discharging the eight women stands as a clear violation of the Fair Labor Standards Act. Seven of the eight were fired because they had filed suit un-

---

2. The court finds that Ethel Hall, based on her testimony, had 40 extra miles per week additional travel to Lynn's Sportswear. The Department of Labor Wages and Hours Compliance Officer, Mr. Ted Cooke, calculated her additional travel expense based on 140 extra miles per week.

3. The court finds that Charlotte Scott, based on her testimony, had 80 extra miles per week additional travel to Lynn's Sportswear. Mr. Cooke calculated her additional travel expense based on 140 extra miles per week.

der the Act for lost wages. The eighth, Cheryl Skidmore Williams, was fired because she was about to file suit under the Act.[4]

The Supreme Court stated in *Mitchell v. De Mario Jewelry, Inc.*, 361 U.S. 288, 292–93, 80 S.Ct. 332, 335–36, 4 L.Ed.2d 323 (1960):

> For it needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions....
>
> In this context, the significance of reimbursement of lost wages becomes apparent. To an employee considering an attempt to secure his just deserts under the Act, the value of such an effort may pale when set against the prospect of discharge and the total loss of wages for the indeterminate period necessary to seek and obtain reinstatement. Resort to statutory remedies might thus often take on the character of a calculated risk, with restitution of partial deficiencies in wages due for past work perhaps obtainable only at the cost of irremediable entire loss of pay for an unpredictable period. Faced with such alternatives, the employees understandably might decide that matters had best be left as they are. We cannot read the Act as presenting those that it sought to protect with little more than a Hobson's choice.

*See also Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir.1977); *Brennan v. Maxey's Yahama, Inc.*, 513 F.2d 179 (8th Cir.1975); *Wirtz v. Ross Packing Co.*, 367 F.2d 549 (5th Cir.1966); *Goldberg v. Bama Mfg. Corp.*, 302 F.2d 152 (5th Cir.1962).

■ The mere showing by the plaintiff that the eight women were fired following protected activities of which the employer was aware establishes a prima facie case of retaliatory dismissal and the burden of going forward shifts to the employer to show legitimate nondiscriminatory reasons for the dismissal. *See Pedreyva v. Cornell Prescription Pharmacies, Inc.*, 465

F.Supp. 936, 948 (D.Colo.1979); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (burden of proof in a Title VII employment discrimination suit). In this case, the plaintiff has produced considerably more; the eight women were explicitly threatened and then fired for testifying at a deposition. Nevertheless, defendants' asserted reasons for the firings must be examined.

At trial Mr. Trigiani testified that he recommended the eight women's discharge because they allegedly lied at the deposition regarding whether a $5.00 per week "bonus" on their paychecks from Schoolhouse Four represented compensation for lost pay resulting from Miss Virginia, Inc.'s failure to pay wages for a period of time prior to its closing. This testimony, though, is belied by the circumstances. First of all, Mr. Montgomery threatened the eight women *before* any of them had testified at the deposition. Second, one of the eight, Cheryl Skidmore Williams, never testified at all.[5] Yet, she was also fired.

In further defense of the firings, defendants' counsel argued that a settlement of the Lee County lawsuit settled not only the Miss Virginia, Inc. lost pay lawsuit but also was a complete settlement of any future claims these women might have, such as the present suit instituted by the Department of Labor. This argument is undermined by both examination of the Lee County lawsuit pleadings, where no such settlement document has ever been filed, and by the testimony of Mr. Trigiani. Mr. Trigiani testified on direct examination by his attorney that the settlement of the Lee County lawsuit related only "to backwages that the women claimed we owed to them at Miss Virginia". The court thus finds no evidence that supports this argument. In conclusion, the court finds that the defendants' proffered reasons for the firings fail to counter the overwhelming evidence that the eight women were fired for impermissible reasons under 29 U.S.C. § 215(a)(3).

---

**4.** *See supra* footnote 1.

**5.** *See supra* footnote 1.

■ 3. The court holds the corporation, Schoolhouse Four, and individual defendants Anthony Trigiani and Clyde Montgomery jointly and severally liable for violation of the Act. 29 U.S.C. § 203(d) states that a covered employer under the Act "includes any person acting directly or indirectly in the interest of an employer in relation to an employee". In addition, the prohibitions in 29 U.S.C. § 215(a)(3) extend to "any person". Clearly, both Mr. Trigiani and Mr. Montgomery both were personally involved in the firings. Thus, they are personally liable for their violation of the Act. *See, e.g., Chambers Construction Co. v. Mitchell,* 233 F.2d 717 (8th Cir.1956); *Brennan v. Control Mfg.,* 76 Lab.Cas. (CCH) ¶ 33,-209 (D.Ariz.1975); *Wirtz v. Soft Drinks of Shreveport, Inc.,* 336 F.Supp. 950 (W.D.La. 1971); *Wirtz v. Sharp,* 16 Wage & Hour Cas. 286 (BNA) (N.D.Tex.1963); *Mitchell v. Crawford Production Co.,* 13 Wage & Hour Cas. 122 (BNA) (N.D.Okl.1956).

■ 4. Damages consist of backwages for the difference between what the eight women would have been paid by Schoolhouse Four and their interim earnings. *Mitchell v. De Mario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Although the plaintiff cites no cases for extra transportation costs as allowable additional damages in Fair Labor Standards Act cases, the National Labor Relations Board routinely allows such extra expenses in analogous backpay awards. *See, e.g., Carter's Rental Co.,* 250 N.L.R.B. Nos. 53 & 54 (1980); *Sioux Falls Stockyards Co.,* 236 N.L.R.B. No. 62 (1978); *Aircraft & Helicopter Leasing & Sales, Inc.,* 27 N.L.R.B. No. 92 (1976); *Chicago Local 245,* 217 N.L.R.B. No. 162 (1975). The court finds that Fair Labor Standards Act backpay awards should similarly reflect the goal to place the injured party "in the situation he would have occupied if the wrong had not been committed". *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), quoting *Wicker v. Hoppock,* 6 Wall. (73 U.S.) 94, 99, 18 L.Ed. 752 (1867).

■ 5. The award will not be reduced by the amount of unemployment compensation received by some of the employees. Such benefits are collateral benefits and are awarded by the state in furtherance of a separate social policy. *See EEOC v. Ford Motor Co.,* 645 F.2d 183 (4th Cir. 1981), *rev'd on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

■ 6. Prejudgment interest, in the discretion of the court, should not be awarded in this case. The trial court "has broad discretion to fashion its decree according to the circumstances of each case". *Clifton D. Mayhew, Inc. v. Wirtz,* 413 F.2d 658, 663 (4th Cir.1969). Given the complicated and variable damages calculation for each of the women, including such variable items as extra travel expense, lost vacation and holiday pay, varying periods of work and rates of pay, the court deems the damages calculation as so unliquidated as to preclude prejudgment interest on the backpay award.

■ 7. Finally, the court observes that the $2,000 cost of the automobile purchased by Ethel Hall is not properly included in an award for violation of 29 U.S.C. § 215(a)(3). To permit both mileage costs at Internal Revenue Service rates and the cost of a capital asset such as an automobile would result in a double recovery. Therefore, the court declines to consider the cost of the automobile in its award calculation.

## Conclusion

Judgment shall enter in favor of the plaintiff and against Schoolhouse Four, Anthony Trigiani, and Clyde Montgomery in the amount of $18,125.30 plus costs. Interest shall accrue from the date of judgment. An appropriate Order shall this day issue.